# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| STEPHANIE A. GILLIARD, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 16-2007 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 18, 23 |
| | : | | |
| MARTIN GRUENBERG, *Chairman, Federal* | : | | |
| *Deposit Insurance Corporation, et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

**GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT;
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; AND DENYING
AS PREMATURE DEFENDANTS' ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Stephanie A. Gilliard, who submitted her amended complaint *pro se* but who is

now represented by counsel, brings this action against the Chairman of the Federal Deposit

Insurance Corporation ("FDIC") and other FDIC employees, alleging race discrimination and

retaliation in violation of Title VII of the Civil Rights Act of 1964. Defendants moved for

dismissal or, in the alternative, for summary judgment, and Ms. Gilliard subsequently moved for

leave to amend her complaint for a second time. For the reasons set forth below, the Court

grants Ms. Gilliard's motion for leave to amend her complaint. Treating Ms. Gilliard's Second

Amended Complaint as the operative complaint, the Court grants Defendants' motion to dismiss,

except as to Counts One, Three, Four, and Eight. The Court also denies Defendants' alternative

motion for summary judgment as premature.

## II.  BACKGROUND

Plaintiff Stephanie Gilliard, an African-American woman, is a Senior Administrative Specialist ("SAS") in the Administrative Management Section ("AMS"), Strategic Planning, Budget and Reporting Branch ("SPBR"), Division of Risk Management Supervision ("RMS") at the FDIC.  Am. Compl. ¶ 4, ECF No. 15.  She has held that role—a grade level CG-13 position—since June 2011.  Gilliard Aff. 14-050 at 1, ECF No. 18-1.  During her tenure, she has filed at least four equal employment opportunity ("EEO") complaints, the first in or around October 2011.  Gilliard Aff. 14-050 at 7.  This action focuses on the period from about March 2013 through December 2014, when, according to Ms. Gilliard, she suffered a host of adverse employment actions—the purported denial of several promotions, the loss of employment responsibilities, unfavorable performance reviews, and exposure to a hostile work environment—because of racial discrimination and/or as retaliation for her protected EEO activity.

### A.  Non-Promotions

### 1.  Acting AMS Chief Position

In March 2013, RMS Director Doreen Eberly issued an Expression of Interest ("EOI") seeking an FDIC employee to serve as Acting Chief of AMS for a 120-day assignment.  Def.'s Facts ¶¶ 6, 8, ECF No. 18; EOI, Ex. C, ECF No. 18-3.  The EOI was open to permanent FDIC employees nationwide at the CG-15 and CM-1 grade levels.  Def.'s Facts ¶ 7; EOI, Ex. C, ECF No. 18-3.  Because Plaintiff is a CG-13 grade level employee, she was not eligible for the position.  *See* Am. Compl. ¶ 11.  FDIC employee Janice Butler was selected and served as Acting Chief—and, consequently, as Ms. Gilliard's first-line supervisor—from early May 2013 through early September 2013.  Def.'s Facts ¶¶ 2, 9; Am. Compl. ¶ 16.

Ms. Gilliard contends that, based on the position description, the Acting AMS Chief position could have been performed at the CG-13 grade level and she asserts that it should have been advertised as such. Am. Compl. ¶ 11. Ms. Gilliard argues that Phillip Mento, the Associate Director of SPBR, RMS and her second-level supervisor, decided to list the position at the CG-15 grade level to intentionally exclude her from the role because of her race and to provide Ms. Butler—who is a white woman—an advantage in competing for the soon-to-be-posted permanent AMS Chief position.[1] Am. Compl. ¶¶ 11–12; Pl.'s List of Material Facts in Dispute ¶ 2, ECF No. 27; Ex. D, Mento Aff. at 4, ECF No. 18-4; Def.'s Facts ¶ 7. Ms. Gilliard further claims that Ms. Butler was not qualified for the AMS Acting Chief position and that Ms. Butler was selected without proper approval from Human Resources. Am. Compl. ¶¶ 14–16.

## 2. Permanent AMS Chief Position

The permanent AMS Chief position was posted under Vacancy Announcement Number ("VA") 2013-HQ-0838, and was open from August 19 through September 3, 2013. Def.'s Facts ¶ 11; Ex. F, ECF No. 18-6. Unlike its acting equivalent, the permanent AMS Chief position was listed at grade level CG-13. *See* Def.'s Facts ¶ 13; Ex. F. Ms. Gilliard applied for the position. *See* Am. Compl. ¶ 15. Like other candidates, she was interviewed by a three-member panel and asked the same three questions as all other interviewees. Def.'s Facts ¶¶ 14–16; Am. Compl. ¶ 15; *see also* Ex. G, Rudolph Aff. 13-055 at 1–2, ECF No. 18-7. According to Defendants, the interview panel recommended the three top-ranked candidates—none of whom were Ms. Gilliard—to Mr. Mento. Def.'s Facts ¶¶ 17–18; *see also* Ex. G, Rudolph Aff. 13-055 at 2. Of the recommended candidates, Mr. Mento selected Ms. Butler for the role. Def.'s Facts ¶¶ 18–19;

---

[1] Ms. Gilliard also contends that Mr. Mento preselected Ms. Butler for the position because of a preexisting personal relationship between the two. Am. Compl. ¶ 17.

*see also* Ex. G, Rudolph Aff. 13-055 at 3; Ex. H, Ex. I, Strickler Aff. 13-055 at 3, ECF No. 18-9.

Ms. Gilliard argues that she was more qualified for the position than Ms. Butler given her

educational background and experience and claims that Ms. Butler was selected for the

permanent Chief position because of her alleged personal relationship with Mr. Mento. Am.

Compl. ¶¶ 15–17. Ms. Gilliard also notes that Mr. Mento issued her a Letter of Reprimand—

based on an incident that occurred months earlier—on the day that she interviewed for the

permanent AMS Chief position, contending that he did so to reflect badly on her during the AMS

Chief application review process. *See* Am. Compl. ¶ 11; Pl.'s Facts in Dispute ¶ 6, ECF No. 27.

### 3. Senior Resource Management Specialist Position

In or around May 2014, AMS Chief Butler hired Suzanne Jeansonne to be her assistant.

Am. Compl. ¶ 63. Thereafter, Ms. Butler created the position of Senior Resource Management

Specialist ("SRMS"); the new position purportedly entailed performance of nearly the same

duties as Plaintiff's position. Am. Compl. ¶ 64. According to Ms. Gilliard, Ms. Butler permitted

Ms. Jeansonne to assist in preparing the posting for the job, even though Ms. Butler was aware

that Ms. Jeansonne planned to apply for it. Am. Compl. ¶¶ 65–66. Indeed, Ms. Gilliard asserts

that Ms. Butler had trained Ms. Jeansonne in hopes of having her take on the SRMS position.

*See* Am. Compl. ¶¶ 63–67. Ms. Gilliard claims that although a three-person selection panel

interviewed candidates for the position, Ms. Butler manipulated the interview process to

advantage Ms. Jeansonne and to disadvantage Ms. Gilliard. *See* Am. Compl. ¶ 68. For example,

Ms. Gilliard contends that she was required to prepare a writing sample on the spot after the

interview while under supervision while Ms. Jeansonne was purportedly permitted to prepare her

writing sample after the interview and may have been provided early information about the

writing prompt. Am. Compl. ¶¶ 66–69.

### 4. Senior Human Resources Specialist (Corporate Employee Program and Student Program) Position

Applications for the position of Senior Human Resources Specialist (Corporate Employee Program and Student Program) ("HR Specialist – CEP"), VA 2014-HQ-1103, were accepted from March 7, 2014 through March 21, 2014. Ex. Y, ECF No. 18-25. According to the vacancy announcement, the position required at least one year of specialized human resources experience, including experience writing staffing policies. *Id.* Ms. Gilliard applied for the job, but Human Resources Officer Monica Cain, who was charged with reviewing and evaluating applications, determined that Ms. Gilliard lacked experience writing staffing policies and therefore did not qualify for the position. *See* Def.'s Facts ¶¶ 50–59; Ex. AA, ECF No. 18-27; Ex. GG, Cain Aff. 15-006R at 4–5, ECF No. 18-33. Like other applicants who were believed to lack required experience, Ms. Gilliard was afforded an opportunity to submit supplemental information to show that she qualified for the position. *See* Def.'s Facts ¶¶ 54–57; *see also* Ex. EE, Email from Stephanie Gilliard to Bettie Smith (April 8, 2014), ECF No. 18-21; Ex. BB, Email from Margo Skinner to Stephanie A. Gilliard (April 11, 2014), ECF No. 18-28.

After reviewing Ms. Gilliard's supplemental submissions, Ms. Cain still determined that Ms. Gilliard lacked the necessary qualifications. Def.'s Facts ¶¶ 56–59; Ex. FF at 2–4, ECF No. 18-32. Ms. Gilliard contends that she would have qualified for the position, if her private sector experience had been properly considered. She asserts that Ms. Cain "willfully obstructed" her right to compete for the position by refusing to look to her private sector work experience to satisfy the requirements. Am. Compl. ¶ 30. According to Ms. Gilliard, Ms. Cain did so as retaliation for Ms. Gilliard's past EEO activity. Am. Compl. ¶ 39.

### 5. Senior Human Resources Specialist (Performance Management) Position

On April 11, 2014—just days after Ms. Gilliard had been notified that she did not qualify for the HR Specialist – CEP position—Ms. Cain reportedly notified FDIC's Dallas Regional Office Human Resources Officer Candy Capper that the electronic job posting for VA 2014-1103 had been breached by an individual from the Dallas Regional Office.  Def.'s Facts ¶ 60; Ex. HH, Capper Aff. at 2–3, ECF No. 18-34; Ex II, Cain Aff. at 2–3, ECF No. 18-35.  Furthermore, the data system reflected that Ms. Gilliard's application materials may have been accessed.  Def.'s Facts ¶ 61; Ex. II, Cain Aff. at 2–3.  Ms. Cain expressed concern that someone may have tampered with Ms. Gilliard's file and asked Ms. Capper to investigate the incident.  Def.'s Facts ¶ 62; Ex. II, Cain Aff. at 2.  In particular, Ms. Cain explained to Ms. Capper that because Ms. Gilliard had filed EEO complaints, they needed to be "especially careful with her job applications."  Ex. II, Cain Aff. at 2; *see also* Ex. HH, Capper Aff. at 2.

Shortly after Ms. Capper's conversation with Ms. Cain, Ms. Capper reportedly mentioned the system breach—including that it involved a job applicant who had a pending EEO complaint—at a staff meeting in the Dallas Office as a "teaching moment" for her staff.  Ex. H, Capper Aff. at 3.  Ms. Gilliard alleges that she received a phone call in late June or early July 2014, from an employee from the Dallas Regional Office who told her that during the meeting Ms. Capper had called Ms. Gilliard "a troublemaker who likes to file EEOC claims."  Am. Compl. ¶ 32; *see also* Ex. GGG at 1, ECF No. 18-59.

About a week after Ms. Gilliard was notified of Ms. Capper's alleged comments, Ms. Gilliard contends that she was scheduled to interview by phone for the Senior Human Resources Specialist (Performance Management) ("HR Specialist – PM") position.  *See* Am. Compl. ¶ 33.  On the day of her interview, Ms. Gilliard called into the interview conference line.  After she

introduced herself to the panel, Ms. Capper announced herself as one of the interview panelists. Ex. III, ECF. No 18-61; Am. Compl. ¶ 34. Ms. Gilliard refused to go forward with the interview, inferring that the other panel members had been "put on notice" about Ms. Capper's impression of Ms. Gilliard. Ms. Gilliard believed that she had been "effectively eliminated for true consideration." Am. Compl. ¶¶ 34–35. Ms. Gilliard contends that Ms. Capper "purposely positioned herself to sit on the panel . . . to enable her to eliminate any possibility of the Plaintiff getting the said position." Am. Compl. ¶ 36. Ms. Capper did so, Ms. Gilliard claims, in retaliation because Ms. Gilliard had engaged in EEO activity. Am. Compl. ¶ 39.

## B. Unfavorable Ratings

Under the FDIC's "Performance Management and Recognition" ("PMR") system, employees are rated on two axes (1) Job Standards and (2) Behavioral Standards. Def.'s Facts ¶ 23. On the Job Standards axis, employees are assigned a numerical rating from 1 ("Unacceptable") to 5 ("Role Model") in five different categories. Def.'s Facts ¶ 26; *see* Ex. JJ, ECF No. 18-36. The five scores are then averaged to arrive at the employee's "Summary Job Standards Rating." *See* Ex. JJ. On the Behavioral Standards metric, employees are rated either "Below Target," "At Target," or "Above Target" in each of four categories. Def.'s Facts ¶¶ 28–9; Ex. JJ.

Ms. Gilliard contends that from December 2013 through December 2014, Mr. Mento and Chief Butler discriminated and/or retaliated against her when they gave her what she regards as unfairly negative evaluations. Ms. Gilliard first cites her December 2013 PMR on which Mr. Mento rated her 3 out of 5 ("Accomplished Practitioner") in all but one Job Standards category, resulting in an average rating of 3.2. Am. Compl. ¶ 76; Def.'s Facts ¶¶ 34, 37; *See* Ex. L, ECF No. 18-12. Ms. Gilliard also complains about mid-year and year-end ratings that Ms. Butler

assigned her in 2014. With regard to her 2014 mid-year review, Ms. Butler rated Ms. Gilliard a

3 in three different Job Standards categories—Demonstrates Technical Knowledge of Program

Area, Applies Analytical Skills, and Provides Consultative Services. Ex. JJ at 7, ECF No. 18-36.

In the remaining two Job Standards categories, Ms. Butler rated Ms. Gilliard a 2. Ex. JJ at 7. In

that same evaluation, Ms. Butler rated Ms. Gilliard "At Target" for all four Behavioral Standards

categories. Ex. JJ. Finally, Ms. Gilliard protests her 2014 year-end evaluation. On that PMR,

Ms. Butler assigned Ms. Gilliard ratings of 3 in two Job Standards categories, and ratings of 2 in

the other three categories, for a Summary Job Standards Rating of 2.4. Ex. JJ at 3. On the

Behavioral Standards axes, Ms. Butler rated Ms. Gilliard "At Target" in three categories and

"Below Target" in the remaining category. Ex. JJ at 3. Ms. Gilliard contends that Ms. Butler

used pretextual reasons to justify the low ratings. Am. Compl. ¶¶ 20–23, 27.

### C. Other Allegations

Ms. Gilliard's Amended Complaint describes a multitude of other purportedly

discriminatory and/or retaliatory actions. Among them, Ms. Gilliard asserts that during the

relevant period, she had some employment responsibilities taken away from her. Most notably,

Ms. Gilliard contends that from about May 2012 through June 26, 2013, she had been tasked

with providing administrative management support for RMS's Large Bank Supervision section

("Large Bank Branch"). Am. Compl. ¶ 73. She complains that Mr. Mento removed her from

this assignment and transferred it to Angela Tarbet, a white woman. *Id.* Ms. Gilliard also claims

that Ms. Butler subjected her work to "excessive edits" while not making similar edits on the

work of white employees, and otherwise offered preferential treatment to white employees. *See*

Am. Compl. ¶¶ 19, 25, 58, 79. Likewise, Ms. Gilliard contends that Ms. Butler worked to turn

other managers at the FDIC against Ms. Gilliard. *See* Am. Compl. ¶¶ 49–54. In addition, Ms.

Gilliard complains that Ms. Butler sent her a Letter of Counseling based on an argument between Ms. Gilliard and a co-worker, who is a white woman. Am. Compl. ¶¶ 21–22. Ms. Gilliard claims that Ms. Butler insufficiently investigated the dispute, failing to seek information from an African-American female witness and relying on accounts from the other participant in the dispute. Am. Compl. ¶ 21.

Finally, Ms. Gilliard describes an incident that occurred on July 9, 2013. That morning, an FDIC Historian was scheduled to present to a group of RMS interns at a kiosk in the FDIC building lobby. *See* Letter of Reprimand ("LOR"), Ex. K at 1, ECF No. 18-11. Ms. Gilliard was assigned to inform the RMS interns about the presentation and to attend the presentation with the interns. *Id.* Ms. Butler and Mr. Mento claimed to have arrived in the lobby at the time the presentation was set to begin, and reported that they spotted neither Ms. Gilliard nor the interns. *Id.* Later, Mr. Mento and Ms. Butler met with Ms. Gilliard, who reportedly claimed that she was in the lobby at the designated presentation start time. *Id.*; *see also* Ex. B at 14, ECF No. 18-2; Ex. D, Mento Aff. at 2, ECF No. 18-4. Ms. Gilliard claims that Mr. Mento raised his voice and called her either a "liar" or a "goddamn liar." Am. Compl. ¶ 75. Mr. Mento later issued Ms. Gilliard a Letter of Reprimand in relation to the incident. *See* LOR, Ex. K.

### E. Procedural History

Plaintiff, who was proceeding *pro se*, filed this action against Defendants on October 7, 2016. *See* Compl., ECF No. 1. In the weeks after, Plaintiff filed an errata sheet, which sought to add claims not mentioned in her first complaint. *See* Second Errata, ECF No. 3. In February 2017, the Court ordered Ms. Gilliard to file one operative complaint setting out all of her claims against Defendants. Order, ECF No. 14. Shortly after, Ms. Gilliard filed her Amended Complaint. *See* Am. Compl., ECF No. 15. In response to Ms. Gilliard's Amended Complaint,

on March 13, 2017, Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. Defs.' Mot., ECF No. 18. On April 6, 2017, counsel appeared on behalf of Ms. Gilliard. *See* Notice of Appearance, ECF No. 22. Days later, Ms. Gilliard's counsel requested leave to file a second amended complaint. Mot. for Leave to File Second Am. Compl. ("Mot. for Leave"), ECF No. 23. Presently before the Court are Plaintiff's Motion for Leave to File a Second Amended Complaint and Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment.

### III. TITLE VII FRAMEWORK

Title VII of the Civil Rights Act of 1964 promises that "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). A separate section of the Act bars employers from "discriminat[ing] against" any employee or job applicant because that individual "has opposed any practice" made unlawful by Title VII or because that individual has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a).

Direct evidence of discrimination or retaliation generally entitles the plaintiff to a jury trial. *See Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). In the absence of direct evidence of discrimination or retaliation, Title VII claims are usually analyzed under the three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff is first required to make out a *prima facie* case of disparate treatment. "To establish a *prima facie* case of discrimination, a claimant must show that '(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference

of discrimination.'" *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). And, to establish a

*prima facie* case of retaliation, the claimant must show that she (1) "engaged in statutorily

protected activity; (2) that [s]he suffered a materially adverse action by h[er] employer; and (3)

that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

Once the plaintiff establishes a prima facie case of discrimination or retaliation, the burden of

production shifts to the defendant to supply "some legitimate, nondiscriminatory [and

nonretaliatory] reason for the [action in question]." *Wiley*, 511 F.3d at 155. After the employer

sets out a nondiscriminatory and nonretaliatory reason for the employment action, the burden

shifts back to the employee to show that "the legitimate reasons offered by the defendant were

not its true reasons, but were a pretext for discrimination." *George v. Leavitt*, 407 F.3d 405, 411

(D.C. Cir. 2005).

The Supreme Court has instructed that the *McDonnell Douglas* standard does not

"transpose[] into a rigid pleading standard for discrimination cases." *Swierkiewicz v. Sorema

N.A.*, 534 U.S. 506, 512 (2002). "[A]t the motion to dismiss stage, the district court cannot

throw out a complaint even if the plaintiff did not plead the elements of a *prima facie* case."

*Brown v. Sessoms*, 774 F.3d 1020, 1023 (D.C. Cir. 2014); *see also Jones v. Air Line Pilots Ass'n,

Int'l*, 642 F.3d 1100 (D.C. Cir. 2011) ("[A]n employment discrimination plaintiff is not required

to plead every fact necessary to establish a *prima facie* case to survive a motion to dismiss."

(citing *Swiekiewicz*, 534 U.S. at 511)). This is because "before discovery has unearthed relevant

facts and evidence, it may be difficult to define the precise formulation of the required *prima

facie* case in a particular case." *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006)

(quoting *Swierkiewicz*, 534 U.S. at 512); *cf. Americable Int'l v. Dep't of Navy*, 129 F.3d 1271,

1274 (D.C. Cir. 1997) ("[S]ummary judgment ordinarily is proper only after the plaintiff has

been given adequate time for discovery."). And, relatedly, "discovery may even uncover direct evidence of discrimination, thus entirely eliminating the need to prove a prima facie case." *Chappell-Johnson*, 440 F.3d at 488–89. However, "the Court may explore the plaintiff's *prima facie* case at the dismissal stage to determine 'whether the plaintiff can ever meet h[er] initial burden to establish a *prima face* case." *Tressler v. Nat'l R.R. Passenger Corp.*, 819 F. Supp. 2d 1, 5 (D.D.C. 2011) (quoting *Rattigan v. Gonazales*, 503 F. Supp. 2d 56, 72 (D.D.C. 2007)). That is, a court must determine whether, accepting the plaintiff's factual contentions as true and drawing all inferences in her favor, the plaintiff has alleged factual content in her complaint that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV. ANALYSIS

### A. Plaintiff's Motion for Leave to Amend Her Complaint is Granted

The Court first considers Ms. Gilliard's request for leave to amend her complaint for a second time. Federal Rule of Civil Procedure 15(a) permits a plaintiff to amend her complaint once as a matter of course within 21 days of serving it or within 21 days of the filing of a responsive pleading. *See* Fed. R. Civ. P. 15(a)(1). Otherwise, she may amend her pleading only with the opposing party's written consent—which has been denied in this case—or the Court's leave. Fed. R. Civ. P. 15(a)(2). Rule 15 instructs courts to "freely give leave when justice so requires." *Id.*; *see also Belizan v. Hershon*, 434 F.3d 579, 582 (D.C. Cir. 2006) (explaining that Rule 15 "is to be construed liberally"). Importantly, "[t]he decision to grant or deny leave to amend . . . is vested in the sound discretion of the trial court." *Commodore-Mensah v. Delta Air Lines, Inc.*, 842 F. Supp. 2d 50, 52 (D.D.C. 2012) (citing *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977)). Generous standard notwithstanding, courts may deny leave to amend for such

reasons as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "Amendments that do not radically alter the scope and nature of the action . . . are especially favored." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 301 F.R.D. 5, 8 (D.D.C. 2013) (quoting *Estate of Gaither ex rel. Gaither v. District of Columbia*, 272 F.R.D. 248, 252 (D.D.C. 2011)). The Court concludes that justice requires permitting Ms. Gilliard to amend her complaint. Accordingly, it deems Ms. Gilliard's Second Amended Complaint filed.

Ms. Gilliard offers several reasons why the Court should permit her to amend her complaint. *See* Mot. for Leave at 5–12. First, she explains that her prior complaints were filed without the aid of counsel and that her Proposed Second Amended Complaint primarily clarifies the facts and legal theories that she already asserted in her prior complaints. *See* Mot. for Leave at 5–12. Ms. Gilliard also emphasizes the liberal standard for granting leave to amend and notes that this Court prefers deciding cases on the merits rather than on technicalities. *See* Mot. for Leave at 5–6, 9–12. In addition, Ms. Gilliard asserts that Defendants are not likely to suffer prejudice as a result of her amendments. *See* Mot. for Leave at 6–9. Defendants primarily oppose Ms. Gilliard's motion on the ground that most of the contemplated amendments would be futile. *See* Defs.' Opp'n to Pl.'s Mot. for Leave to File Second Am. Compl. ("Opp'n to Mot. for Leave") at 5–44, ECF No. 44. Defendants also assert that Ms. Gilliard has already amended her complaint once, that Ms. Gilliard was aware of the information underlying her proposed amendments when she filed her original complaint, that some of Ms. Gilliard's proposed amendments are purportedly brought in bad faith, that Ms. Gilliard engaged in undue delay in

filing her Second Amended Complaint, and that Defendants will be prejudiced if Ms. Gilliard is permitted to amend her complaint. Opp'n to Mot. for Leave at 2–5, 8–10, 38–39, 41, 44–45.

First, the Court determines, in its discretion, that it is appropriate to consider Defendants' futility arguments in the context of evaluating Defendants' motion to dismiss rather than in considering whether Ms. Gilliard should be permitted to amend her complaint. *See Driscoll v. George Washington Univ.*, 42 F. Supp. 3d 52, 57 (D.D.C. 2012) ("Because review for futility 'is, for practical purposes, identical to review of a Rule 12(b)(6)' motion to dismiss, [defendant's] futility arguments are addressed below, as part of the Court's consideration of [defendant's] arguments for dismissal." (citation omitted)). Second, the Court finds Defendants' other arguments in favor of denying Ms. Gilliard's motion unpersuasive. While it is true, for example, that Ms. Gilliard previously amended her complaint, she did so because the Court ordered her to set out all of her claims in one complaint. Her previous amendments did not alter the substance of her claims let alone constitute the sort of "repeated failure to cure deficiencies" that might justify denying her leave to amend her complaint. *See Stanard v. Nygren*, 658 F.3d 792, 800–01 (7th Cir. 2011) (affirming district court's denial of plaintiff's motion for leave to amend his complaint for a third time where plaintiff "repeatedly failed to follow explicit directions from the district court about how to correct specific problems in the first two complaints.").

Defendants argue that the Court might infer bad faith from proposed amendments that "directly contradict allegations in the original pleading." Opp'n to Mot. for Leave at 9. Specifically, Defendants cite Ms. Gilliard's decision not to mention in her Second Amended Complaint allegations featured in her prior complaints that Mr. Mento hired Ms. Butler for the Acting Chief of AMS position due to a personal relationship. *See* Opp'n to Mot. for Leave at 9–10, 38–39; Am. Compl. ¶¶ 12, 17. "Under some circumstances, motions to amend that are

intended to avoid summary judgment or otherwise 'muddy the waters' of the court's resolution of the case may be denied as brought in bad faith." *Sherrod v. McHugh*, 249 F. Supp. 3d 85, 87 (D.D.C. 2017). Defendants have, however, fallen well short of establishing bad faith on Ms. Gilliard's part.

First, it is hardly clear that Ms. Gilliard's Proposed Second Amended Complaint contradicts claims asserted in her Amended Complaint. Ms. Gilliard's Amended Complaint, which was filed *pro se*, must be construed liberally. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). So construed, her Amended Complaint appears to assert both that Ms. Mento hired Ms. Butler due to a purported personal relationship and that Mr. Mento hired Ms. Butler and did not hire Ms. Gilliard for racially discriminatory reasons. *See* Am. Compl. ¶ 11 (contending that Mr. Mento had "intentionally exclude[d] the Plaintiff and provide[d] Janice Butler, Caucasian co-worker an unfair competitive advantage to get the permanent [AMS Chief] position."); *Id.* ¶ 17 (asserting that Mr. Mento engaged in "prohibited personnel practices" by selecting Ms. Butler for the AMS Chief position due to his alleged personal relationship with her). The fact that Ms. Gilliard's Proposed Second Amended Complaint asserts separate claims against Mr. Mento—one alleging "prohibited personnel practices" and another alleging race discrimination under Title VII—based on these same events lends support to the notion that Ms. Gilliard intended to state two different claims to this effect. *See* 2nd Am. Compl. ¶¶ 22–25, 83–85, ECF No. 23-1.

Because the Court construes Ms. Gilliard's Amended Complaint as asserting both claims,[2] it can hardly infer bad faith from Ms. Gilliard's decision to narrow the focus of her claims in her Second Amended Complaint.  As another court in this Circuit explained "[t]hat the original complaint included additional allegations and alleged a broader conspiracy does not preclude Plaintiffs from narrowing the focus of their lawsuit, nor does it suggest bad faith." *Hourani v. Mirtchev*, 282 F.R.D. 278, 279 (D.D.C. 2012); *see also Sherrod*, 249 F. Supp. 3d at 87 (explaining that a party "may move to amend to 'clarify and amplify' the allegations in [her] complaint in light of . . . arguments made by the opposition.").  Indeed, the D.C. Circuit has stated that "[u]nless a defendant is prejudiced on the merits by a change in legal theory . . . a plaintiff is not bound by the legal theory on which he or she originally relied."  *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999) (quoting *Hanson v. Hoffmann*, 628 F.2d 42, 53 (D.C. Cir. 1980)).  Accordingly, the Court disagrees that this basis justifies denying Ms. Gilliard an opportunity to amend her complaint.

The Court also perceives no undue delay on Ms. Gilliard's part.  *See* Opp'n to Mot. for Leave at 44–45.  Typically, courts deny Rule 15 motions on the basis of undue delay only "when the plaintiffs waited many years before seeking amendments, after discovery had already concluded or summary judgment had already been granted."  *Jiggetts v. Cipullo*, 2018 WL 317812, at *3 (D.D.C. Jan. 5, 2018) (collecting cases).  Not one of those circumstances is present

---

[2] Even assuming that these claims are inconsistent with one another, the Federal Rules of Civil Procedure permit "a party to state as many claims or defenses as it has, regardless of consistency."  Fed. R. Civ. P 8(d)(3); *see also Brooks v. Grundmann*, 748 F.3d 1273, 1279 (D.C. Cir. 2014) ("Title VII cases often involve multiple, sometimes mutually exclusive, theories of relief, and nothing prevents a plaintiff from pleading in the alternative, if only for the sake of preservation."); *Juergens v. Urban Title Servs., Inc.*, 533 F. Supp. 2d 64, 76 (D.D.C. 2008) (concluding that plaintiff's purportedly contradictory allegations state a claim against defendant and survive defendant's motion to dismiss because "the Federal Rules of Civil Procedure permit pleading in the alternative").

in this case.  Ms. Gilliard filed her motion for leave to amend only about six months after this litigation began—and only about a month after Defendants filed their motion to dismiss or, in the alternative, for summary judgment.  The parties have yet to conduct discovery.  And, at the time that Ms. Gilliard filed her request, the Court had not yet passed on any dispositive motions.  A delay of mere months, before the parties have conducted any discovery and before the Court has ruled on any dispositive motions, certainly does not constitute undue delay.

Finally, Defendants assert that they will suffer prejudice if they are required to "again pore over the over 4,000 page administrative record, concerning three administrative complaints, spanning a period of three years, to mount defenses each time Plaintiff creates a new iteration of, or attempts to expand upon previously raised claims."  Opp'n to Mot. for Leave at 45. Defendants, however, conflate slight inconvenience with undue prejudice and seem to disregard the liberal standard for granting leave to amend under Rule 15.  Rejecting a similar argument, Judge Friedman recently explained:

> "Undue prejudice is not mere harm to the non-movant but a denial of the opportunity to present facts or evidence which would have been offered had the amendment been timely."  *Does I through III v. District of Columbia*, 815 F. Supp. 2d 208, 215 (D.D.C. 2011) (internal quotation marks omitted).  "[A]n amendment is not automatically deemed prejudicial if it causes the non-movant to expend additional resources.  Any amendment will require some expenditure of resources on the part of the non-moving party. 'Inconvenience or additional cost to a defendant is not necessarily undue prejudice.'"  *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 301 F.R.D. 5, 9 (D.D.C. 2013) (quoting *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 6–7 (D.D.C. 2008)).  Indeed, "if [a] court were to employ a policy of denying [ ] leave to amend in every situation where an amended [pleading] may result in additional discovery or expense, then [the] court would fail to abide by the legal standard of granting leave 'freely . . . when justice so requires.'"  *Hisler v. Gallaudet Univ.*, 206 F.R.D. 11, 14 (D.D.C. 2002) (quoting Fed. R. Civ. P. 15(a)(2)).

*United States v. All Assets Held at Bank Julius*, 229 F. Supp. 3d 62, 69 (D.D.C. 2017)

(alterations in original). Defendants have failed to explain any way that permitting Ms.

Gilliard's request to amend her complaint might deny them an opportunity to present facts or

evidence. Indeed, because Ms. Gilliard moved for leave to amend her complaint before the

parties even began to conduct discovery and before the Court considered any dispositive

motions, it is hardly apparent that Defendants will incur significantly increased litigation costs as

a result of Ms. Gilliard's amendments. In sum, Defendants have failed to show that they will be

unduly prejudiced.

***

Because the Court concludes that justice requires permitting Ms. Gilliard to amend her

complaint and because Defendants have failed to demonstrate any reason why leave to amend

should be denied, the Court grants Ms. Gilliard's motion. Ms. Gilliard's Proposed Second

Amended Complaint (ECF No. 23-1) shall be deemed filed.

### B. Defendants' Motion to Dismiss is Granted in Part and Denied in Part

The Court next considers Defendants' futility arguments as a motion to dismiss. *Cf.*

*Driscoll v. George Washington Univ.*, 42 F. Supp. 3d 52, 57 (D.D.C. 2012) (considering

defendant's futility arguments made in opposition to plaintiff's motion for leave to amend as a

motion to dismiss). "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." *Id.*

With respect to some of Defendants' arguments for dismissal, Defendants rely on materials outside of the pleadings. Federal Rule of Civil Procedure 12(d) provides that, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." "The decision to convert a motion to dismiss into a motion for summary judgment . . . is committed to the sound discretion of the trial court." *Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 85 (D.D.C. 2012) (quoting *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 50 (D.D.C. 2006)). In exercising its discretion, a court must "assure itself that summary judgment treatment would be fair to both parties." *Id.* at 85–86 (quoting *Tele-Commc'ns of Key West, Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985)). "A motion may be treated as one for summary judgment even if the parties have not been provided with notice or an opportunity for discovery if they have had a reasonable opportunity to contest the matters outside of the pleadings such that they are not taken by surprise." *Bowe-Connor*, 845 F. Supp. 2d at 86.

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary

judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

Ms. Gilliard's Second Amended Complaint presents five types of claims—race discrimination in violation of Title VII (Counts One–Three), hostile work environment (Count Four), retaliation and reprisal (Counts Five–Nine), prohibited personnel practices (Counts Ten–Thirteen), and intentional infliction of emotional distress (Count Fourteen). *See* 2nd Am. Compl. The Court concludes that Defendants' motion to dismiss should be granted, except as to Counts One, Three, Four, and Eight which survive.

## 1. Race Discrimination Counts (Counts One–Three)

Ms. Gilliard's Second Amended Complaint asserts three counts of race discrimination against Defendants Janice Butler and Phil Mento. In order to establish a *prima facie* case of race discrimination under Title VII, a plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). To survive a motion to dismiss, however, a plaintiff need not set out a *prima facie* case. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12 (2002); *see also Fennel v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011) ("The pleading burden is not great, and courts in this Circuit have consistently recognized the 'ease with which a plaintiff claiming employment discrimination can survive a . . . motion to dismiss.'" (alteration in original) (quoting *Rouse v. Berry*, 680 F. Supp. 2d 233, 236 (D.D.C. 2010))). "Yet, although a plaintiff asserting a

discrimination claim is not required to plead a *prima facie* case, she still must plead sufficient facts to show a plausible entitlement to relief." *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 87 (D.D.C. 2016). The Court concludes that, while Counts One and Three meet this standard, Count Two does not. Accordingly, Defendants' motion to dismiss Count Two is granted.

### i. Count One Survives Defendants' Motion to Dismiss

Count One relates to Ms. Gilliard's nonselection for the SRMS position. *See* 2nd Am. Compl. ¶¶ 10–21. Specifically, in this Count, Ms. Gilliard contends that Ms. Jeansonne, a Caucasian woman, was afforded myriad advantages in competing for the SRMS position, including the opportunity to assist in preparing the vacancy announcement for the position. *See* 2nd Am. Compl. ¶¶ 10–21. Ms. Jeansonne was selected for the position and Ms. Gilliard was not, and Ms. Gilliard contends that she was not selected because she is an African American woman. 2nd Am. Compl. ¶¶ 19–21. Defendants assert that Count One should be dismissed because Ms. Gilliard cannot show that her nonselection for the SRMS position constituted an adverse employment action and because Ms. Gilliard has offered no evidence from which a reasonable juror might infer that any adverse employment action was taken due to Ms. Gilliard's race. Opp'n to Mot. for Leave at 5–7. The Court finds that Count One survives Defendants' motion to dismiss.

Defendants first argue that Ms. Gilliard's claim regarding her nonselection for the SRMS position fails because "if Plaintiff had been selected for the SRMS position, it would have been merely a lateral move preventing it from being an adverse action." Opp'n to Mot. for Leave at 7. Defendants base this argument on Ms. Gilliard's contention that "[t]he duties for th[e SRMS] position were essentially the same as the duties Plaintiff had been performing at the FDIC for

approximately three years." Opp'n to Mot. for Leave at 6 (quoting 2nd Am. Compl. ¶ 10). It is true that when a plaintiff alleges that she was denied a lateral transfer, she "does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999), *abrogated on other grounds by Steele v. Schafer*, 535 F.3d 689 (D.C. Cir. 2008); *see also Ritchie v. Napolitano*, 196 F. Supp. 3d 54, 61 (D.D.C. 2016) ("[T]he mere fact that an employee wanted a particular assignment is not enough to make that employee's non-selection for that assignment a materially adverse employment action."). The Court believes that it is a very reasonable assumption that Plaintiff sought the position because it was, in some way or another, career enhancing. Though Ms. Gilliard has not explicitly spelled out the materially adverse consequences affecting the terms of her employment or future employment opportunities, the Court declines to assume that Ms. Gilliard suffered no adverse employment action just because her current position and the position she sought involved many of the same duties. Drawing all reasonable inferences in Ms. Gilliard's favor—as the Court must at this stage—the Court cannot say that Count One fails on this basis. *Cf. Bouknight v. District of Columbia*, 538 F. Supp. 2d 44, 49 (D.D.C. 2008) ("Because the complaint is silent as to the nature of the transfer, and because the plaintiff now contends that the transfer adversely affected his earning capacity, the court denies defendant's motion to dismiss."). Upon presentation of evidence at the summary judgment stage, the Court's conclusion may be different.

Defendants also argue that Ms. Gilliard has presented no evidence that might give rise to an inference of discrimination. The Court disagrees. The D.C. Circuit has established that a

plaintiff can show that an unfavorable action gives rise to an inference of discrimination by "demonstrating that she was treated differently from similarly situated employees who are not part of the protected class." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). This is exactly the sort of claim Ms. Gilliard makes. Ms. Gilliard asserts that she was treated differently than Ms. Jeansonne, a Caucasian woman and the selectee for the SRMS position, because of race. *See* 2nd Am. Compl. ¶ 21. Accordingly, the Court concludes that Ms. Gilliard has set forth sufficient facts to survive Defendants' motion to dismiss Count One.

### ii. Count Two is Dismissed

Count Two clarifies Ms. Gilliard's contention that Mr. Mento discriminated against her on the basis of race when he posted the Acting AMS Chief position at the CG-15 grade level instead of at the CG-13 level, thereby precluding Ms. Gilliard from competing for the position. 2nd Am. Compl. ¶¶ 22–25. Defendants argue that Count Two should be dismissed because Ms. Gilliard has alleged no facts that could demonstrate that her nonselection for the temporary detail assignment constituted an adverse employment action. Opp'n to Mot. for Leave at 10–11. The Court agrees.

The D.C. Circuit has held that the denial of a temporary detail does not constitute an adverse employment action under Title VII. *See Maramark v. Spellings*, No. 06-5099, 2017 WL 2935411, at *1 (D.C. Cir. Sept. 20, 2007) (per curiam); *Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002) (denial of "acting" designation is not harm cognizable under Title VII); *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997) ("Courts applying Title VII have consistently focused on 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensation . . . [and not] interlocutory or mediate decisions having no immediate effect upon employment conditions." (alteration in original) (quoting *Page v. Bolger*, 645 F.2d 227, 233 (4th

Cir. 1981) (en banc))). In doing so, the Circuit has observed that the alleged harm of "denial of a [short-term] detail that might have allowed [a plaintiff] to secure a permanent position [with the employer] is too speculative to constitute an 'objectively tangible harm.'" *Maramark*, 2007 WL 2935411, at *1 (quoting *Stewart*, 275 F.3d at 1135). Ms. Gilliard's allegations are precisely this type. Because the denial of a temporary detail cannot constitute an adverse employment action, a claim rooted in the purported denial of an opportunity to compete for the position must also fail. Accordingly, Count Two is dismissed because Ms. Gilliard has not successfully alleged a claim of race discrimination under Title VII.[3]

### iii. Count Three Survives Defendants' Motion to Dismiss

Count Three presents allegations about Ms. Gilliard's nonselection for the permanent AMS Chief position. *See* 2nd Am. Compl. ¶¶ 26–30. As in her Amended Complaint, Ms. Gilliard claims that Ms. Butler was selected for the AMS Chief position, though she purportedly did not qualify for the position and was allegedly not properly approved by Human Resources. 2nd Am. Compl. ¶ 29. Defendants argue that Ms. Gilliard cannot demonstrate a nexus between her nonselection for this position and race discrimination, primarily because in a prior complaint Ms. Gilliard stated that the "real reason" that Mr. Mento selected Ms. Butler for the position was because of an intimate relationship. Opp'n to Mot. for Leave at 11–12. Defendants also contend that Ms. Butler was properly approved by Human Resources. Opp'n to Mot. for Leave at 12. The Court concludes that neither basis justifies dismissing Ms. Gilliard's claim.

---

[3] Though the Court dismisses Count Two, dismissal does not preclude Ms. Gilliard from introducing evidence related to this nonselection in the context of her other claims. For example, to the extent that Plaintiff alleges that the Acting position was steered to a particular candidate in order to give her a leg up for obtaining the position on a permanent basis, evidence concerning the Acting position would certainly be relevant.

As the Court explained above in rejecting Defendants' arguments against permitting Ms. Gilliard to amend her complaint, Ms. Gilliard's race discrimination claim is not precluded because she previously offered a second—possibly, but not necessarily, inconsistent[4]—theory for why Ms. Butler was selected for the permanent AMS Chief position. *Cf. Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999) ("[A] plaintiff is not bound by the legal theory on which he or she originally relied."). The Court perceives Ms. Gilliard's choice to refocus her complaint as a permissible clarification and narrowing of her allegations and not a ground for dismissing Ms. Gilliard's claim. *See Sherrod v. McHugh*, 249 F. Supp. 3d 85, 87 (D.D.C. 2017). Furthermore, Defendants' contention that Ms. Butler was properly approved by Human Resources for the AMS Chief position identifies a factual dispute, but does not provide a basis for dismissing Ms. Gilliard's claim. Because Ms. Gilliard has alleged the basic elements of a race-based discrimination claim—that is, Ms. Gilliard contends that Defendants did not select her for the AMS Chief position because of her race and instead selected a different person who is of a different race— the Court concludes that Count Three survives Defendants' motion to dismiss.

## 2. Ms. Gilliard's Hostile Work Environment Claim (Count Four) Survives Defendants' Motion

Count Four alleges that in 2013 and 2014, Defendants subjected Ms. Gilliard to a hostile work environment because of her race. *See* 2nd Am. Compl. ¶¶ 31–55. Defendants challenge the scope of Ms. Gilliard's claim, arguing that she has improperly joined discrete, unexhausted allegations of discrimination to her hostile work environment claim. Defendants also contend that Ms. Gilliard's allegations fail to state a hostile work environment claim because they do not

---

[4] As the Court explained above, the Federal Rules of Civil Procedure permit plaintiffs to plead in the alternative, thus Ms. Gilliard need not show consistency across claims.

rise to the level of severity or pervasiveness required for such a claim. Opp'n to Mot. for Leave at 13–26. The Court disagrees with both arguments.

Ms. Gilliard asserts a host of allegations as part of her hostile work environment claim. Specifically, Ms. Gilliard alleges that Ms. Butler (1) "made excess edits on Plaintiff's work without providing consistent and ongoing feedback to insure her success on the job"; (2) altered Plaintiff's work chart to make it seem as if she had made intentional errors; (3) was "routinely rude to Plaintiff" and criticized her work in front of others; (4) assigned Plaintiff substantially more work than other employees; (5) emailed Plaintiff's clients to undermine their opinions about the quality of Plaintiff's work; (6) ordered an audit of Plaintiff's compensatory time to harass Plaintiff and to damage her reputation; (7) ordered Plaintiff to redo assignments while "secretly telling others not to tell [Plaintiff] that the work was fine"; (8) removed an assignment from Plaintiff's charge when it was nearly completed then credited a different employee for the work; (9) assigned Plaintiff ratings that were lower than she deserved; (10) claimed that Plaintiff leaned over Ms. Butler's desk in a threatening manner to damage Plaintiff's reputation; (11) gave Plaintiff a Letter of Counseling without properly investigating the underlying incident; (12) claimed that Plaintiff's managers had reported difficulties working with Plaintiff, but failed to speak with African American managers; (13) "re-typed documents Plaintiff submitted to add in error[s] that were not made by Plaintiff and made it look like Plaintiff had made those errors"; (14) told Ms. Gilliard that she could not record conversations that she had at the FDIC "when they suspected that she was trying to protect herself from false allegations"; (15) attempted to destroy Plaintiff's relationship with other employees by making it appear as if Plaintiff had been insubordinate; (16) told another employee to exclude Plaintiff from communications and workshops related to the Student Intern Program; (17) assigned two Caucasian women "who

were less senior and/or less qualified than Plaintiff to do work that gave them valuable experience and increased their opportunities and chances of promotion"; (18) reassigned Plaintiff's work to others while Plaintiff was sick then refused to give it back when Plaintiff returned to work; (19) told an employee at the Dallas Regional FDIC office that Plaintiff had filed many EEO claims; and (20) cancelled Plaintiff's Telework Agreement. 2nd Am. Compl. ¶¶ 31–55. In addition, Ms. Gilliard complains that Mr. Mento called her a "God Damn Liar" after a dispute and that Mr. Mento issued Ms. Gilliard a Letter of Reprimand in September 2013, immediately after her interview for the Chief of AMS position, based on an incident that occurred in July 2013. 2nd Am. Compl. ¶¶ 51–52. Ms. Gilliard asserts that Mr. Mento did so with the intent to subject Ms. Gilliard to racially discriminatory intimidation. 2nd Am. Compl. ¶ 55. Finally, Ms. Gilliard asserts that Laura Lapin and Kimber Polley contributed to the constant harassment to which Plaintiff was subjected. 2nd Am. Comp ¶¶ 32, 54.

The Court first addresses Defendants' argument that Ms. Gilliard has not properly exhausted her administrative remedies with respect to certain aspects of her hostile work environment claim. *See* Opp'n to Mot. for Leave at 19–26. This argument relies on materials outside of the pleadings. Because Ms. Gilliard has had fair notice and an opportunity to contest arguments regarding whether she properly exhausted her hostile work environment claim, the Court concludes that it is appropriate to convert Defendants' motion to dismiss into a motion for summary judgment with respect to this count. *See Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 85–86 (D.D.C. 2012).

Defendants complain that Ms. Gilliard "only generally asserted" certain allegations during the administrative process and failed to cite certain incidents as aspects of a hostile environment claim at the administrative level. *See* Opp'n to Mot. for Leave at 19–20. For

example, at the administrative level, Ms. Gilliard asserted a discrete claim of race discrimination related to Chief Butler's purported cancellation of Plaintiff's telework agreement.  *See* Ex. OO, Ex. 18-41.  Plaintiff now includes that allegation as part of her hostile environment claim.  *See* Opp'n to Mot. for Leave at 20–21; 2nd Am. Compl. ¶ 53.  As the Court explained above, an individual complaining of alleged violations of Title VII must first exhaust her administrative remedies before proceeding to federal district court.  *See Park v. Howard Univ.*, 71 F.3d 904, 906–07 (D.C. Cir. 1995).  Moreover, any civil action that follows an administrative complaint of discrimination is "limited in scope to claims that are 'like or reasonably related to the allegations of the [administrative] charge and growing out of such allegations.'"  *Id.* (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).  In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court explained that "[h]ostile environment claims are different in kind from discrete acts" of discrimination.  *Id.* at 115.  The Supreme Court held that, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Id.* at 117.  But *Morgan* is not "an open sesame to recovery for time-barred violations."  *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011).  The D.C. Circuit has explained that "[b]oth incidents barred by the statute of limitations and ones not barred can qualify as 'part of the same actionable hostile environment claim' only if they are adequately linked into a coherent hostile environment claim—if, for example, they 'involve[] the same type of employment actions, occur[] relatively frequently, and [are] perpetrated by the same managers.'"  *Id.* (alteration in original) (quoting *Morgan*, 536 U.S. at 120–21).

The Court does not take issue with the scope of Ms. Gilliard's claim.  There is no question that at the administrative level Ms. Gilliard complained that she had been subjected to a

hostile work environment on the basis of race during the period from May 1, 2013 to October 24, 2013 and during the period from January 1, 2014 to December 31, 2014. *See* Ex. A, ECF No. 18-1 (describing forty-three purportedly hostile incidents during 2014); Ex. B, ECF No. 18-2 (describing more than twenty purportedly hostile incidents during the period of May 2013 to October 2013); *see also* Ex. OO (accepting a claim that Ms. Gilliard was "subjected to harassment that rose to the level of a hostile work environment from May 1, 2013 through October 24, 2013, based on her race"); Ex. UU, ECF No. 18-47 (accepting a claim that Ms. Gilliard was "subjected to a hostile work environment on the bas[is] of race (African American) . . . from January 1, 2014 through August 29, 2014"). In addition, at the administrative level, Ms. Gilliard lodged a host of discrete complaints that are now mentioned as part of one hostile work environment claim, most of which purportedly occurred in 2013. Defendant does not argue that the allegations listed in Count Four are not adequately linked into one coherent hostile environment claim. The Court observes that the purported actions involved the same managers—namely, either Chief Butler, Mr. Mento, or both. *See* 2nd Am. Compl. ¶¶ 31–55. And according to Ms. Gilliard, many of the actions occurred frequently. *See, e.g.*, 2nd Am. Compl. ¶ 36 (asserting that Chief Butler "continuously assigned Plaintiff much more work than any other [SRMS]"). Moreover, according to Ms. Gilliard, all of the actions were taken to create a hostile work environment for Plaintiff due to her race. 2nd Am. Compl. ¶ 54.

It is of no significance that Ms. Gilliard "only generally asserted" certain aspects of her hostile work environment claim at the administrative level. The upshot of *Morgan* is that "plaintiffs may incorporate non-exhausted allegations into a hostile work environment claim so long as some allegations were exhausted and all of the allegations together form one hostile environment claim." *Nguyen v. Mabus*, 895 F. Supp. 2d 158, 187 (D.D.C. 2012); *see also, e.g.*,

*Leach v. Nat'l R.R. Passenger Corp.*, 128 F. Supp. 3d 146, 152–55 (concluding that a plaintiff whose administrative complaint had alleged a hostile work environment based primarily—but not exclusively—on the actions of one supervisor had sufficiently exhausted her claim as to hostile-work-environment allegations related to other coworkers). That is the case here. Ms. Gilliard's hostile work environment claim is likewise not doomed by the fact that she earlier asserted some of the allegations as discrete Title VII claims. The D.C. Circuit has clarified that "although a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard, neither can a court dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own." *Baird*, 662 F.3d at 1252. This is because there is no rule barring plaintiffs from asserting different Title VII claims based on the same acts and because "of course, plaintiffs are free to plead alternative theories of harm that might stem from the same allegedly harmful conduct." *Id.* The Court finds that all of the allegations of mistreatment asserted in Count Four make up a single, properly exhausted hostile environment claim.

The Court next addresses Defendants' argument that Ms. Gilliard has not set forth facts sufficient to support her hostile work environment claim. To make out a hostile work environment claim, a plaintiff must demonstrate that the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult'" and that this behavior is "'sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'"

*George v. Leavitt*, 497 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  Accordingly, no violation occurs "if the victim does not subjectively perceive the environment to be abusive" or if the conduct "is not severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris*, 510 U.S. at 21–22.  "In determining whether an actionable hostile work environment exists, [courts] look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Morgan*, 536 U.S. 101 at 116 (quoting *Harris*, 510 U.S. at 23).  These standards "ensure that Title VII does not become a general civility code" that polices "the ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788 (citation and internal quotation marks omitted).

Considering the evidence in the light most favorable to Ms. Gilliard, the Court concludes that Count Four survives Defendants' motion to dismiss.  Defendants point to particular allegations as insufficient, but "[t]he Court . . . is obliged to consider the whole picture, not just particular pixels" in assessing whether a host of incidents amount to a pervasive pattern of hostility and ridicule. *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 84 (D.D.C. 2002).  While many of Ms. Gilliard's allegations are not particularly severe, the breadth and scope of her allegations convinces the Court that the alleged discriminatory conduct was sufficiently pervasive to survive Defendants' motion. *Cf. Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) ("Severity and pervasiveness are complementary factors and often go hand-in-hand, but a hostile work environment claim could be satisfied with one or the other.").  Although the Court might conclude differently once the facts are developed through discovery, for now, the Court denies Defendants' motion.

### 3. Retaliation and Reprisal Counts (Count Five–Nine)

Counts Five through Nine of Ms. Gilliard's Second Amended Complaint allege retaliation and reprisal for Ms. Gilliard's protected EEO activity. "Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because [s]he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e–3(a)). To establish a *prima facie* case of retaliation, a plaintiff must show "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by h[er] employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). "A materially adverse action is one that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (quoting *Burlington*, 548 U.S. at 57). Under these standards, "not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); *see also Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (distinguishing between "purely subjective injuries" which are not actionable, and "objectively tangible harm," which is). At the motion to dismiss stage, the court must ask whether the plaintiff "alleged facts that, taken as true, render h[er] claim of retaliation plausible." *Harris v. District of Columbia Water & Sewer Authority*, 791 F.3d 65, 70 (D.C. Cir. 2015).

There is little doubt that Plaintiff has sufficiently alleged that she engaged in statutorily protected EEO activity. *See* 2nd Am. Compl. ¶ 57 (alleging that beginning in October 2011, Plaintiff filed various EEO complaints against the FDIC); *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209 ("An activity is protected if it involves opposing alleged discriminatory

treatment by the employer or participating in legal efforts against the alleged treatment."
(quoting *Globus v. Skinner*, 721 F. Supp. 329, 334 (D.D.C. 1989)). Defendants argue, however,
that these counts must fail because Ms. Gilliard has not alleged any materially adverse actions
and has failed to show any causal link between her protected EEO activity and any materially
adverse action. *See* Opp'n Mot. for Leave at 26–37. The Court concludes that the actions
alleged in Counts Five, Six, Seven, and Nine do not constitute materially adverse actions
actionable under Title VII. Accordingly, those counts are dismissed. However, Count Eight of
Ms. Gilliard's Second Amended Complaint sufficiently states a claim for retaliation and,
accordingly, Defendants' motion to dismiss is denied with respect to that count.

### i. Count Five is Dismissed

Count Five alleges that, throughout 2013 and 2014, Ms. Butler assigned Ms. Gilliard
work that allowed for subjective assessment of performance and that Ms. Butler offered
"excessive edits" and criticism of Ms. Gilliard's work. Count Five also complains about the
PMR ratings Ms. Butler assigned Ms. Gilliard in May 2014. 2nd Am. Compl. ¶¶ 56–60.
Defendants argue that Ms. Gilliard has not alleged a materially adverse action, as is required to
state a retaliation claim. The D.C. Circuit has established that "[i]n order for a performance
evaluation to be materially adverse, it must affect the employee's 'position, grade level, salary,
or promotion opportunities.'" *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009). Likewise,
"job-related constructive criticism" does not constitute a materially adverse action. *See Baloch*,
550 F.3d at 1199. Because Plaintiff has not alleged that Ms. Butler's "excessive edits" and
"criticism" of her work or PMR ratings affected her position, grade level, salary, or promotion
opportunities, the Court agrees with Defendants that the allegations made in Count Five do not
constitute materially adverse actions. Accordingly, Count Five is dismissed.

## ii. Count Six is Dismissed

Count Six asserts that Plaintiff was subjected to retaliation and reprisal when Ms. Butler issued her a Letter of Counseling because of an in-office argument Ms. Gilliard had with a co-worker. 2nd Am. Compl. ¶¶ 61–66. Ms. Gilliard contends that Ms. Butler failed to speak to an African American female witness to the dispute who purportedly would have verified that Ms. Butler "was not rude in any way" during the argument. 2nd Am. Compl. ¶ 65. Defendants argue that Ms. Gilliard has not identified any materially adverse action to which Defendants subjected her. The Court agrees. The D.C. Circuit rejected the sufficiency of a claim like the one asserted in Count Six in *Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008). In *Baloch*, the Circuit explained that an employer issuing a "letter of counseling, letter of reprimand, and unsatisfactory performance review" that contained "job-related constructive criticism" could not alone rise to the level of a materially adverse action necessary to sustain a claim of unlawful retaliation. *Id*. at 1199. Instead, written warnings must typically lead to consequences like "ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities," *Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005), to constitute adverse employment actions under Title VII. *See also Baloch*, 550 F.3d at 1199 (concluding that a negative performance evaluation did not constitute an adverse action because plaintiff had not produced evidence showing that it "could affect his position, grade level, salary, or promotion opportunities"). Because Ms. Gilliard fails to connect her receipt of the Letter of Counseling to any of these types of harm, the Court concludes that this claim fails, and accordingly, the Court dismisses Count Six.

### iii.  Count Seven is Dismissed

Count Seven alleges that Mr. Mento and Ms. Butler "burst into Plaintiff's office and told her that she was not to record any conversations that she had with FDIC employees. 2nd Am. Compl. ¶ 68.  Later, Plaintiff reportedly received an email from a different person instructing her than it was FDIC practice not to allow the recording of any conversations among FDIC employees. 2nd Am. Compl. ¶ 68.  Ms. Gilliard claims that Ms. Butler's and Mr. Mento's conduct constituted reprisal and retaliation because they knew that Plaintiff "planned to use the recordings in [her] EEO claims." 2nd Am. Compl. ¶ 69.  Defendants argue that Count Seven must be dismissed because Ms. Gilliard suffered no materially adverse action. Opp'n to Mot. for Leave at 29–30.  The Court agrees.  As another court in this Circuit explained, "while actually subjecting Plaintiff to disciplinary action may have amounted to materially adverse action, merely advising h[er] via email that if [s]he continued a course of action [s]he *might* be subject to discipline does not." *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 61 (D.D.C. 2011), *aff'd in part*, No. 12–5016, 2012 WL 3243983 (D.C. Cir. Aug. 7, 2012).  Accepting Ms. Gilliard's allegations as true, the warnings that she might be disciplined do not constitute materially adverse actions. *See Baloch*, 550 F.3d at 1199 (declining to label the threat of proposed suspension a materially adverse action under Title VII).  Accordingly, the Court dismisses Count Seven.

### iv.  Count Eight Survives Defendants' Motion

Count Eight contends that during a staff meeting in June 2014, Candy Capper, an HR Officer at the FDIC's Dallas Regional Office, referenced Ms. Gilliard's EEO activity, purportedly stating that Ms. Gilliard "was a troublemaker and [who] liked to file EEO claims." 2nd Am. Compl. ¶ 71.  Plaintiff asserts that Ms. Capper learned of Ms. Gilliard's prior EEO

activity from AMS Chief Butler.  2nd Am. Compl. ¶ 71.  About a month later, Ms. Gilliard applied for and was set to be interviewed for the position of HR Specialist – PM.  2nd Am. Compl. ¶ 72.  However, upon discovering that Ms. Capper was a member of the interview panel for the position, Ms. Gilliard stated that she did not want to go forward with the interview.  2nd Am. Compl. ¶¶ 72–74.  Though Ms. Capper agreed to be removed from the panel, Ms. Gilliard declined to participate in the rescheduled interview because she had no way of knowing whether Ms. Capper had made disparaging remarks about her to other interviewers.  2nd Am. Compl. ¶ 75.  Ms. Gilliard contends that Ms. Butler told Ms. Capper about her past EEO activity to discourage Ms. Capper from hiring Ms. Gilliard and that Ms. Butler did so in retaliation for Ms. Gilliard's EEO activity.  2nd Am. Compl. ¶ 76.  Ms. Gilliard also claims that Ms. Capper purposely placed herself on the interview panel for the HR Specialist – PM position to deny Ms. Gilliard an "opportunity to fairly compete for the position."  2nd Am. Compl. ¶ 76.  Defendants argue that Count Eight should be dismissed because Ms. Gilliard failed to file an administrative complaint regarding her non-selection for the HR Specialist – PM position and because Ms. Gilliard cannot establish that Defendants took any materially adverse action toward her.  Opp'n to Mot. for Leave at 30–32.  The Court denies Defendants' request.

Defendants contend that Count Eight must be dismissed because Ms. Gilliard failed to raise any administrative claim regarding her nonselection for the HR Specialist – PM position.  Opp'n to Mot. for Leave at 31.  Because Defendants rely on materials outside of the pleadings, the Court concludes that their motion to dismiss should be converted into a motion for summary judgment with respect to this count.  *See Bowe–Connor v. Shinseki*, 845 F. Supp. 2d 77, 85–86 (D.D.C. 2012) (describing the standard for determining when to convert a motion to dismiss into a motion for summary judgment).  "The statutory scheme of Title VII requires a plaintiff to

exhaust his or her administrative remedies before a civil action may be filed in federal court."

*Robinson–Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 12 (D.D.C. 2008). The scheme

also limits the scope of a Title VII lawsuit "to claims that are 'like or reasonably related to the

allegations of the [administrative] charge and growing out of such allegations.'" *Park v. Howard*

*Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497,

500 (7th Cir. 1994)). A reasonably related allegation "fall[s] within the scope of 'the

administrative investigation that can reasonably be expected to follow a charge of

discrimination.'" *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997). While

it is true that none of Ms. Gilliard's administrative complaints explicitly mentioned her

nonselection for the HR Specialist – PM position, Ms. Gilliard did complain that she was

discriminated against on the basis of reprisal when "on July 6, 2014, [she] learned that the Dallas

Regional Office's Human Resources Officer stated in a staff meeting that [Ms. Gilliard is] a

troublemaker who likes to file EEO complaints." Ex. XX. Accordingly, the question for the

Court is whether the claims asserted in Count Eight reasonably relate to that administrative EEO

complaint. The Court concludes that the allegations are sufficiently related.

Count Eight asserts that Ms. Butler told Ms. Capper about Ms. Gilliard's protected EEO

activity in an effort to discourage Ms. Capper from hiring Ms. Gilliard. 2nd Am. Compl. ¶ 76.

Under Ms. Gilliard's theory, Ms. Capper learned of Ms. Gilliard's EEO activity and garnered the

view that Ms. Gilliard was "a troublemaker" based on conversations with Ms. Butler. The Court

expects that investigation of Ms. Gilliard's administrative complaint would have included

inquiry into when and how Ms. Capper learned about Ms. Gilliard's EEO activity. Count Eight

also alleges that Ms. Capper "purposely placed herself on the interview panel for the

accomplished purpose of essentially preventing the Plaintiff from having the opportunity to fairly

compete" for the HR Specialist – PM position. 2nd Am. Compl. ¶ 76. This allegation likewise relates to Ms. Gilliard's administrative claim—the reason Ms. Gilliard worried about whether she would be afforded an opportunity to compete for the HR Specialist – PM position was because of Ms. Capper's alleged comments regarding Ms. Gilliard's EEO activity. The Court concludes that Count Eight is sufficiently "like or reasonably related to" the reprisal claim described in Plaintiff's administrative complaint to permit her to bring her claim in a lawsuit.

Defendants also argue that, even if Ms. Gilliard exhausted her administrative remedies, for this claim, Count Eight should be dismissed because Ms. Gilliard cannot demonstrate that she suffered a materially adverse action. Opp'n to Mot. for Leave at 31–32. The Court disagrees.

An action is materially adverse for purposes of Title VII's antiretaliation provision if it might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington v. Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67–68 (2006). While Defendants construe Ms. Gilliard's claim as focusing on her nonselection for the HR Specialist – PM position, the Court perceives it as centering on the disclosure of her protected EEO activity to other FDIC employees in a manner that encouraged those employees to allegedly deny Ms. Gilliard the opportunity to compete for other positions.[5] The Court cannot say as a matter of law that such claims are not materially adverse—a reasonable employee might be dissuaded from

---

[5] To the extent that Ms. Gilliard's claim indeed focuses on her nonselection for the HR Specialist – PM position, it cannot survive Defendants' motion to dismiss. To make out a *prima facie* case of retaliation, Ms. Gilliard must show some causal link between her protected EEO activity and some materially adverse action taken by her employer. *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). According to Ms. Gilliard's Second Amended Complaint, she refused to go forward with the interview process after learning that Ms. Capper was on the interview panel, thereby removing herself from consideration for the position. 2nd Am. Compl. ¶ 75. Because Ms. Gilliard removed her own name from consideration for the position, no reasonable jury could infer a causal link between Ms. Gilliard's protected activity and the FDIC's nonselection of Ms. Gilliard for this position.

making or supporting a charge of discrimination if her colleagues shared information about her protected EEO activity and discouraged others from hiring her as a result. The D.C. Circuit reached a similar conclusion in *Mogenhan v. Napolitano*, 613 F.3d 1162 (D.C. Cir. 2010). In that case, a Title VII plaintiff alleged that her supervisor had posted information about her EEO complaints on an agency intranet website, where her fellow employees could and did access it. *Id.* at 1166. The plaintiff contended that her supervisor did this to ostracize her with other employees and to label her as "a troublemaker." *Id.* Reversing the district court's dismissal of the retaliation claim, the Circuit explained that "a jury could believe that broadcasting an EEO complaint would . . . chill a reasonable employee from further protected activity." *Id.* Accordingly, the Court will not dismiss Count Eight.

### v. Summary Judgment is Granted for Defendants on Count Nine

Count Nine asserts that the FDIC employees who were charged with reviewing Ms. Gilliard's application for the HR Specialist – CEP position improperly refused to consider her private sector experience to determine whether she qualified for the position and that they did so as retaliation for Ms. Gilliard's EEO activity. 2nd Am. Compl. ¶¶ 78–82. Defendants argue that Ms. Gilliard may not pursue this claim because she failed to timely file suit in this Court. Opp'n to Mot. for Leave at 32–35. Because this argument relies on materials outside of the pleadings, the Court converts Defendants' motion to dismiss into a motion for summary judgment with respect to Count Nine. Having considered the materials in the record and the parties' arguments, the Court agrees with Defendants that Count Nine is untimely asserted.

Pursuant to 29 C.F.R. § 1614.407, an employee must file her Title VII action in federal court "[w]ithin 90 days of receipt of the final action or an individual . . . complaint if no appeal has been filed." The record shows—and Ms. Gilliard agrees—that she received a final agency

decision on claims related to her non-selection for the HR Specialist – CEP position by, at the latest, June 7, 2016. [6] Ex. VVV, Email from Mueller to Gilliard (attaching final agency decision by email); Pl's Opp'n to Defs.' Mot. to Dismiss at 29, ECF No. 27. Accordingly, accounting for one holiday, Ms. Gilliard's complaint must have been filed in this Court by September 6, 2016, which Ms. Gilliard apparently does not dispute. *See* 29 C.F.R. § 1614.604; Pl's Opp'n to Defs. Mot. to Dismiss at 29. The docket reflects that Ms. Gilliard filed an *in forma pauperis* request with this Court on September 8, 2016, two days after the filing deadline.

Citing the "mailbox rule," Ms. Gilliard contends that her complaint was timely filed because she mailed it on September 6, 2016. *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss at 29. Ms. Gilliard misapprehends the nature of the mailbox rule. Under this rule, courts measure the timeliness of a filing submitted by a *pro se* prisoner based on the date the filing was placed in the mail rather than the date on which the court received it. *See Gray v. Staley*, 140 F. Supp. 3d 84, 85 (D.D.C. 2015). But courts have squarely restricted application of the mailbox rule to *pro se* prisoners. *See Kareem v. FDIC*, 482 F. App'x 594 (D.C. Cir. 2012) (per curiam) ("Appellant is not entitled to the benefits of the "mailbox rule" because he is not a prisoner."). Indeed, when the Supreme Court announced the mailbox rule in *Houston v. Lack*, 487 U.S. 266 (1988), it explained why "in th[e] particular context" of *pro se* prisoners, policy grounds justify departing from the otherwise apt "general rule making receipt the moment of filing." *Id.* at 275.

Because Ms. Gilliard is not entitled to the benefits of the mailbox rule, the Court must use the September 8, 2016, date to calculate the timeliness of her complaint—a filing date that she

---

[6] The agency mailed its final decision on June 3, 2016, and the record shows that it was delivered to Ms. Gilliard's address on June 4, 2016. *See* Ex. TTT, U.S. Postal Tracking Service Form; *see also* Ex. VVV, Email from Mueller to Gilliard. However, Ms. Gilliard complained by email that she had not received the letter, thus, the decision letter was later emailed to her. *See* Ex. VVV.

apparently agrees would make her claim untimely. *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss at 29. The Court agrees. Courts in this jurisdiction have "strictly construed the [ninety]-day statute of limitations in Title VII cases, even where the plaintiff is proceeding *pro se*." *Miller v. Downtown Bid Servs. Corp.*, 281 F. Supp. 3d 15, 19 (D.D.C. 2017) (alteration in original) (quoting *Ruiz v. Vilsack*, 763 F. Supp. 2d 168, 173 (D.D.C. 2011)). Accordingly, "courts 'will dismiss a suit for missing the deadline by even one day.'" *Id.* (quoting *Wiley v. Johnson*, 436 F. Supp. 2d 91, 96 (D.D.C. 2006)). Ms. Gilliard barely missed her deadline, but barely is enough to preclude her from arguing her claim before this Court. Summary judgment is granted for Defendants on Count Nine.

### 4. Ms. Gilliard's Prohibited Personnel Practice Claims (Counts Ten–Thirteen) Are Dismissed

Counts Ten–Thirteen of Ms. Gilliard's Second Amended Complaint allege that various FDIC employees engaged in "prohibited personnel practices." Specifically, Count Ten alleges that Mr. Mento engaged in prohibited practices with respect to the posting of the AMS Chief position and that, because of Mr. Mento's actions, Ms. Butler was afforded "an unfair advantage" in competing for the position; Count Eleven alleges that Ms. Capper and Ms. Butler "conspired to make sure that Candy Capper would interview plaintiff for the position of [HR Specialist – PM] in order to insure that Plaintiff would be denied the position despite her qualifications"; Count Twelve contends that Ms. Cain and Ms. Capper wrongfully deemed Ms. Gilliard unqualified for the HR Specialist – CEP position; and Count Thirteen asserts that Ms. Butler committed unspecified violations that afforded Ms. Jeansonne an unfair advantage in competing for the SRMS position. *See* 2nd Am. Compl. ¶¶ 83–96. Like Defendants, the Court construes these counts as asserting violations of Ms. Gilliard's rights under the Civil Service

Reform Act of 1978 ("CSRA"), 5 U.S.C. § 2302.[7]  The Court concludes that Counts Ten–

Thirteen must be dismissed for lack of jurisdiction because Ms. Gilliard has not shown that she

exhausted her administrative remedies.

"The CSRA protects covered federal employees against a broad range of personnel

practices, and it supplies a variety of causes of action and remedies to employees when their

rights under the statute are violated."  *Grosdidier v. Broad. Bd. of Governors*, 560 F.3d 495, 497

(D.C. Cir. 2009).  Generally speaking, "the CSRA precludes resort to other statutory schemes for

aggrieved federal employees raising nonconstitutional claims against their employers."

*Spagnola v. Mathis*, 809 F.2d 16, 30 (D.C. Cir. 1986).  There are three basic paths under which

CSRA claims can properly wind up in federal court.  Under the first path, an employee brings

her prohibited personnel practice claims to the Office of the Special Counsel ("OSC") for

investigation.  *See Horsey v. Harris*, 953 F. Supp. 2d 203, 212 (D.D.C. 2013).  "[I]f the OSC

finds that there was a prohibited personal action as defined by [5 U.S.C.] § 2303, it reports its

findings to the [Merit Systems Protection Board ("MSPB")], and it can petition the MSPB on the

employee's behalf.  If the OSC finds no agency wrongdoing, then the employee herself may

bring an action before the MSPB."  *Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 268–

69 (D.D.C. 2017) (quoting *Stella v. Mineta*, 284 F.3d 135, 142 (D.C. Cir. 2002)).  Then, except

under circumstances not relevant here, an employee may seek review of the MSPB decision in

---

[7]  Ms. Gilliard has had fair notice that the Court might construe her contentions as such. Defendants had construed "prohibited personnel" claims in Plaintiff's earlier complaint as asserting claims under the CSRA.  *See* Def.'s MSJ at 3–13, ECF No. 18.  Indeed, Plaintiff responded directly to these claims in opposing that motion; in doing so, she offered no push back on the notion that her allegations were appropriately construed as complaints under the CSRA. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 18, ECF No. 27.  Furthermore, Defendants construed Ms. Gilliard allegations in Counts Ten–Thirteen of her now-operative Second Amended complaint as asserting claims under the CSRA.  *See* Opp'n for Leave at 37–43. Plaintiff filed no response.

the United States Court of Appeals for the Federal Circuit.  *See Perry v. Merit Sys. Protection Bd.*, 137 S. Ct. 1975, 1981 (2017) (citing 5 U.S.C. § 7703(b)(2)).

The other two paths are reserved for what are known as "mixed cases."  A "mixed case" exists "[w]hen an employee complains of a personnel action serious enough to appeal to the MSPB *and* alleges that the action was based on discrimination."  *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012); *see also* 5 U.S.C. § 7702(a)(1).  Importantly, the "serious enough" infractions that may form the basis of a mixed case are strictly circumscribed.  An employee must complain of either "(1) removal, (2) suspension for more than fourteen days, (3) reduction in grade, (4) reduction in pay, [or] (5) a furlough of thirty days or less" to bring a mixed case.  *Abou-Hussein v. Mabus*, 953 F. Supp. 2d 251, 260 (D.D.C. 2013).

Under the second path, an employee bringing a mixed case may "first file a discrimination complaint with the agency itself, much as an employee challenging a personnel practice not appealable to the MSPB could do."  *Kloeckner*, 568 U.S. at 45.  "If the agency decides against her, the employee may then either take the matter to the MSPB or bypass further administrative review by suing the agency in district court."  *Id.*  Alternatively, under the third path, "the employee may initiate the process by bringing her case directly to the MSPB, forgoing the agency's own system for evaluating discrimination charges."  *Id.*  Then, "[i]f the MSPB upholds the personnel action . . . [the employee] may request additional administrative process, this time with the EEOC, or else she may seek judicial review."  *Id.*  In sum, to present her claims in federal court, among other things, Ms. Gilliard must have either lodged a standard prohibited personnel claim with the OSC or she must have brought a mixed case before either the EEO or the MSPB.

There is no evidence on record showing that Ms. Gilliard pursued her prohibited personnel claims before the OSC. Indeed, Ms. Gilliard appears to concede that she did not file such a complaint. *See* Pl.'s Mot. in Opp'n at 18, ECF No. 27. Rather, she argues that she properly exhausted her claims by bringing a mixed case before the EEO. *See id.* To be sure, there is some evidence that Ms. Gilliard attempted to file a claim of "prohibited personnel practices" before the EEO. *See* Ex. ZZ (denying request to modify EEO claims to include a "[v]iolation of prohibited personnel practice"). Ms. Gilliard neglects, however, that in order to bring a mixed case, "a plaintiff must allege that the defendant has taken one of the five designated actions against h[er]." *Abou-Hussein*, 953 F. Supp. 2d at 260. That is, she must have alleged that the FDIC removed her, suspended her for more than fourteen days, reduced her grade, reduced her pay, or furloughed her otherwise her claim does not qualify as a mixed case. *See id.* There is no indication that Ms. Gilliard ever lodged such allegations. Certainly, none of the claims presented in Count Ten–Thirteen allege that she was removed, suspended, reduced in grade, had her pay reduced, or that she was furloughed.

Ms. Gilliard has not shown that she either presented a standard claim of prohibited personnel practices before the OSC or that she brought a mixed claim before either the EEO or the MSPB. Accordingly, this Court has no jurisdiction over Counts Ten–Thirteen. *See Sagar v. Lew*, 211 F. Supp. 3d 262, 266–67 (D.D.C. 2016) (dismissing CSRA claims for lack of jurisdiction where employee had not presented his claims to the OSC and the case, which had been presented before the EEO, did not qualify as "mixed"). The Court hereby dismisses Counts Ten–Thirteen for lack of jurisdiction.[8]

---

[8] Defendants also argue that Ms. Gilliard's claim fails because the CSRA applies to the FDIC only with respect to certain types of prohibited personnel practices, none of which are at

### 5. Allegations of Intentional Infliction of Emotional and Physical Distress (Count Fourteen) Are Dismissed

Count Fourteen asserts that Defendants' conduct caused Plaintiff "[e]xtreme [e]motional and [p]hysical distress." 2nd Am. Compl. ¶¶ 97–98. The Federal Tort Claims Act ("FTCA") provides "[t]he exclusive remedy for torts committed by Government employees in the scope of their employment." *Wilson v. U.S. Dep't of Transp.*, 759 F. Supp. 2d 55, 64 (D.D.C. 2011). Accordingly, the Court construes Count Fourteen as a claim under the FTCA. In order to bring a suit under the FTCA, a plaintiff must have exhausted her administrative remedies, which requires her to have "(1) presented a federal agency with a claim describing, with particularity, the alleged injury and damages and (2) either received a written denial of the claim from the agency or waited six months from the date of filing without obtaining a final agency disposition." *Totten v. Norton*, 421 F. Supp. 2d 115, 122 (D.D.C. 2006). A plaintiff bears the burden of establishing the she took the necessary steps to exhaust her administrative remedies. *Id.* at 123. Exhaustion is a jurisdictional prerequisite to bringing a tort suit against the United States. *See GAF Corp. v. United States*, 818 F.2d 901, 904–05 (D.C. Cir. 1987). Because Ms. Gilliard has offered no indication that she exhausted her administrative remedies under the FTCA, the Court must dismiss Count Fourteen for lack of jurisdiction.[9]

---

issue in this case. Because the Court concludes that it does not have jurisdiction over Ms. Gilliard's CSRA claims, it does not reach this question.

[9] In any event, it is not clear that Ms. Gilliard can assert a claim under the FTCA for any on-the-job injury. The Federal Employees' Compensation Act, 5 U.S.C. § 8101 ("FECA"), "preclude[s] federal employees from bringing suits for money damages for injuries sustained during the course of their employment." *Davis v. United States*, 973 F. Supp. 2d 23, 28 (D.D.C. 2014). However, the D.C. Circuit has not yet determined whether FECA covers intentional infliction of emotional distress. *See id.* at 28 n.4.

**C. Defendants' Alternative Motion for Summary Judgment is Denied as Premature**

As an alternative to dismissal, Defendants argue that they are entitled to summary judgment on the claims asserted in Ms. Gilliard's Amended Complaint. The Court denies Defendants' request for summary judgment as premature with respect to Counts One, Three, Four, and Eight, which remain at this time.[10]

As the Court explained above, the principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). To show entitlement to summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the party opposing summary judgment must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In doing so, the nonmovant may not rely on "statements that are impermissible hearsay or that are not based on personal knowledge." *Shuler v. District of Columbia*, 744 F. Supp. 2d 320, 327 (D.D.C. 2010). In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255.

---

[10] The Court denies this motion as premature, notwithstanding the Court's conclusion that, with respect to certain of Defendants' arguments for dismissal, it is appropriate to convert Defendants' motion to dismiss to a motion for summary judgment.

The Court concludes that any assessment of Defendants' request for summary judgment is premature at this time. The D.C. Circuit has stated that "summary judgment ordinarily 'is proper only after the plaintiff has been given adequate time for discovery.'" *Americable Int'l v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1997). This practice recognizes that a nonmovant can hardly identify disputes of fact to stave off summary judgment if she has had only limited opportunity to develop and understand the facts. Indeed, in the context of discrimination cases, courts in this jurisdiction have acknowledged that "summary judgment must be approached with special caution." *Gray v. Universal Serv. Admin. Co.*, 581 F. Supp. 2d 47, 57 (D.D.C. 2008). In such cases, plaintiffs often face difficulty uncovering clear proof of discrimination or retaliatory intent. *See Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014). Employers possess emails, hiring records, and other materials on which a plaintiff might rely to prove her claim. Given the information asymmetry, it is hardly fair to expect that a (purported) victim will arrive in Court with a smoking gun in her hand. Accordingly, the Court denies Defendants' motion for summary judgment on the remaining counts at this time.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for leave to amend is granted and her second Amended Complaint is deemed filed. Treating Ms. Gilliard's Second Amended Complaint as the operative complaint, the Court grants Defendants' motion to dismiss, except as to Counts One, Three, Four, and Eight. The Court denies Defendants' alternative motion for summary judgment with respect to these counts as premature. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 26, 2018                              RUDOLPH CONTRERAS
                                                    United States District Judge