# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STEPHANIE A. GILLIARD,        :
                            :

    Plaintiff,                 :       Civil Action No.:     16-2007 (RC)
                            :

    v.                     :       Re Document Nos.:  46, 47
                            :

JELENA MCWILLIAMS, *Chairman, Federal*  :
*Deposit Insurance Corporation*, *et al.*,[1]  :
                            :

    Defendants.             :

## MEMORANDUM OPINION

### DENYING PLAINTIFF'S MOTION FOR PROTECTIVE ORDER; DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## I. INTRODUCTION

Plaintiff Stephanie A. Gilliard seeks a protective order, a temporary restraining order, and a preliminary injunction authorizing her to decline to hand over to her employer, the Federal Deposit Insurance Corporation ("FDIC"), audio tapes containing conversations between her and her supervisors that she recorded surreptitiously while at work. Ms. Gilliard also asks this Court to bar the FDIC from taking disciplinary action against her for making the recordings and for refusing to allow her employer to access them. Finding that Ms. Gilliard has not demonstrated that the relief that she seeks is warranted, the Court denies her motions.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Jelena McWilliams as a defendant.

## II.  BACKGROUND

Ms. Gilliard, an African-American woman, is a Senior Administrative Specialist in the

Administrative Management Section ("AMS"); Strategic Planning, Budget, and Reporting

Branch ("SPBR"); Division of Risk Management Supervision ("RMS") at the FDIC.  *See* 2d

Am. Comp. ¶¶ 4, 6–7, ECF No. 53.  She has worked at the FDIC since June 2011.  *See* Gilliard

Affidavit at 1, Ex. A, Def.'s Combined Opp'n to Pl.'s Mot. for Protective Order & Mot. for

Temp. Restraining Order & Prelim. Injunction ("Def.'s Opp'n"), ECF No. 52-1.  According to

Ms. Gilliard, her tenure has been marked by "years" of "harassment, discrimination, infliction of

severe emotional distress, threats, disparate treatment and more from her supervisors."  Mot. for

Protective Order at 3, ECF No. 46.

Ms. Gilliard filed this action in October 2016.  *See* Compl., ECF No. 1.  In her complaint,

she alleged that during a period from about March 2013 to December 2014, she suffered a host

of alleged adverse employment actions—the denial of several promotions, the loss of

employment responsibilities, unfavorable performance reviews, and exposure to a hostile work

environment—due to racial discrimination and/or as retaliation for her protected EEO activity.

*See generally* 2d Am. Compl.  Many of Ms. Gilliard's claims focus on her interactions with Ms.

Janice Butler (the former Chief of AMS and Ms. Gilliard's former first-line supervisor) and Mr.

Phillip Mento (the former Associate Director of SPBR, RMS and Ms. Gilliard's former second-

line supervisor).  *See* 2d Am. Compl. ¶¶ 6–7, 10–30.  One such allegation states that Ms. Butler

and Mr. Mento learned that Ms. Gilliard had been recording conversations she had with them

and that she planned to use the recordings to support her claims before the Equal Employment

Office.  *See* 2d Am. Compl. ¶¶ 45, 67–69.  Purportedly to stop her from doing so, on or about

October 29, 2014, Ms. Butler and Mr. Mento ordered Ms. Gilliard not to record conversations

she had with any FDIC employees and warned her that she would face disciplinary action if they learned that she had defied their order. *See* 2d Am. Compl. ¶ 68. Ms. Gilliard asserted that the order was given as retaliation for her engagement in protected EEO activity. *See* 2d Am. Compl. ¶ 69. In addition, Ms. Gilliard contended that the command constituted part of a hostile work environment. *See* 2d Am. Compl. ¶ 45.

Shortly after Ms. Gilliard filed her complaint, Defendant FDIC moved to have it dismissed. *See generally* Def.'s Mot. to Dismiss or, in the Alternative for Summ. J., ECF No. 18. While Defendant's motion was pending, Ms. Gilliard filed the motions for a protective order and for a temporary restraining order and preliminary injunction that are presently before the Court.[2] *See generally* Mot. for Protective Order; Mot. for Temp. Restraining Order & Prelim. Injunction ("Mot. for PI"), ECF No. 47.

Ms. Gilliard's motions concern events that occurred in 2017 and early 2018. In July 2017, Ms. Gilliard emailed Maureen Sweeney, the Deputy Director of RMS, seeking "medical leave due to stress" and asking for "intervention" in Ms. Gilliard's dealings with Mr. Mento. *See* Email from Gilliard to Sweeney (July 17, 2017), Ex. H, ECF No. 52-8. Ms. Gilliard asserted that Mr. Mento "continued to lie to [her] about [her] performance expectations, milestones and instructions," and contended that when around Mr. Mento, she "fear[ed] for her physical safety" and "fe[lt] like a victim of rape." Email from Gilliard to Sweeney (July 17, 2017), Ex. H. The next month, Ms. Gilliard followed up with Ms. Sweeney, suggesting that she could provide audio tapes of meetings during which Mr. Mento had purportedly lied to and berated her. Email from Gilliard to Sweeney (Aug. 23, 2017), Ex. J, ECF No. 52-10.

---

[2] The Court has since resolved the FDIC's motion, dismissing some of Ms. Gilliard's claims and denying summary judgment as premature. *See Gilliard v. Gruenberg*, No. 16-2007, 2018 WL 1471949, at *7–20 (D.D.C. Mar. 26, 2018).

Days later, Mr. Joseph Masisak, the Assistant Director for Labor and Employee Relations at the FDIC, emailed Ms. Gilliard, noting that his staff was investigating her recent complaint and asking for evidence that would assist in the investigation. *See* Email from Masisak to Gilliard (Aug. 25, 2017), Ex. K, ECF No. 52-11. Asserting that she had "endured . . . more than 4 years of [Mr.] Mento 'trumping' up charges against [her]," Ms. Gillard declined to turn over any evidence in her possession, but noted that she would hand over her recordings for purposes of entering a settlement agreement. *See* Email from Gilliard to Masisak (Aug. 25, 2017), Ex. K, ECF No. 2-11. In response, Mr. Masisak repeated his request, explaining that the FDIC's Anti-Harassment Program requires employees to cooperate in fact-finding inquiries concerning allegations of harassment, that Ms. Gilliard's email to Ms. Sweeney suggested that she possessed audio recordings that revealed Mr. Mento's harassment, and that the tapes would assist the investigators in coming to the most appropriate outcome. *See* Email from Masisak to Gilliard (Aug. 30, 2017), Ex. L, ECF No. 52-12.

Because, in Ms. Gilliard's view, "it was clear that the [FDIC] was only concerned with protecting itself," instead of immediately submitting her audio tapes to Mr. Masisak, she filed a workers' compensation claim with the Department of Labor's Officer of Workers' Compensation Programs. Reply to Def.'s Combined Opp'n to Pl.'s Mot. for Protective Order & Mot. for Temp. Restraining Order & Prelim. Injunction ("Pl.'s Reply") at 4, ECF No. 55; *see also* Notice of Occupational Disease and Claim for Compensation ("Workers' Comp. Claim") at 1 (Sept. 1, 2017), Ex. O, ECF No. 52-15. In her claim, Ms. Gilliard alleged, among other things, that in 2013, Mr. Mento had "disparaged" her and had "verbally abused and assaulted" her, causing her to suffer post-traumatic stress disorder. Workers' Comp. Claim at 1. Ms. Gilliard

wrote that because she feared that no one would believe her assertions, she had recorded

conversations with Mr. Mento. *See* Workers' Compl. Claim at 1.

Before the Department of Labor resolved Ms. Gilliard's workers' compensation claim,

Ms. Gilliard supplied Mr. Masisak and others with a few audio recordings that captured meetings

between Ms. Gilliard and Mr. Mento. *See* Email from Gilliard to Masisak, *et al.* (Oct. 17, 2017),

Ex. M, ECF No. 52-13; *see also* Email from Masisak to Gilliard (Oct. 18, 2017) (requesting any

additional audio recordings that might support Ms. Gilliard's claims), Ex. N, ECF No. 52-14.

According to emails accompanying the audio recordings, they were captured at meetings that

took place in early 2017. *See, e.g.*, Email from Gilliard to Masisak, *et al.* (Oct. 17, 2017), Ex. M

at 1. Thereafter, Ms. Gilliard received notice denying her workers' compensation claim. *See*

Notice of Decision, Ex. BB, ECF No. 52-28.

Nearly two months after the denial of Ms. Gilliard's workers' compensation claim,

Benjamin Vaughn, the Acting Associate Director of SPBR, sent Ms. Gilliard a memorandum

ordering her to attend an investigatory interview about the allegations that she had made in her

claim about Mr. Mento. *See* Order to Participate in Investigatory Interview, Ex. U, ECF No. 52-

21. The memorandum warned that "[f]ailure to fully cooperate and respond truthfully could lead

to a disciplinary action up to and including removal from federal service." Order to Participate

in Investigatory Interview, Ex. U. Though Ms. Gilliard regarded the request as curious because

her claim had already been denied, she nonetheless attended the meeting. *See* Mot. for

Protective Order at 6; Admin. Inquiry (Feb. 21, 2018) at 1, Ex. V, ECF No. 52-22.

At the meeting, an employee from FDIC's Labor and Employees Relations section first

asked Ms. Gilliard several questions about her allegations. *See* Admin. Inquiry (Feb. 21, 2018),

at 1–3, Ex. V. Then, Mr. Vaughn ordered Ms. Gilliard to provide copies of all audio recordings

featuring any FDIC employees that she had made after October 29, 2014, without obtaining

permission to record. *See* Admin. Inquiry (Feb. 21, 2018) at 1–4, Ex. V; *see also* Order to

Provide Audio Files, Ex. W, ECF No. 52-23.  Mr. Vaughn offered Ms. Gilliard three options for

providing the audio recordings: (1) she could email a complete, unedited copy of each audio file;

(2) she could provide her phone to the FDIC's Division of Internet Technology ("DIT"), and DIT

would make a copy of each audio file; or (3) she could provide her phone to a mutually

acceptable transcription service, which would provide a transcript of each audio recording at the

FDIC's expense. *See* Admin. Inquiry (Feb. 21, 2018) at 4, Ex. V; *see also* Order to Provide

Audio Files, Ex. W.  Mr. Vaughn ordered Ms. Gilliard to elect one of the three options by close

of business on the day after the meeting. *See* Order to Provide Audio Files, Ex. W.  And he

directed her to provide the audio files no later than one day after she selected an option. *See*

Order to Provide Audio Files, Ex. W.  At the meeting, Ms. Gilliard asserted that she would not

comply with the order. *See* Admin. Inquiry (Feb. 21, 2018) at 4, Ex. V.

When Ms. Gilliard failed to comply with the deadlines that Mr. Vaughn had established,

he sent her another order once again demanding that she produce the recordings. *See generally*

Second Order to Produce Recordings, Ex. X, ECF No. 52-24.  Mr. Vaughn's memorandum

stated that Ms. Gilliard's refusals constituted "insubordination" and that her "misconduct will

result in a proposal for disciplinary action."  Second Order to Produce Recordings, Ex. X.  The

memorandum addressed a host of concerns that Ms. Gilliard had voiced about the order. *See*

Second Order to Produce Recordings, Ex. X.  In addition, it provided three reasons for the

FDIC's request: (1) to obtain information necessary to perform a complete investigation of Ms.

Gilliard's allegations against Mr. Mento, (2) because the audio recordings showed that Ms.

Gilliard had violated the October 2014 order directing her not to surreptitiously record her

conversations with FDIC employees, and (3) because the recordings might contain confidential information about FDIC employees.  Second Order to Produce Recordings at 2, Ex. X.

Ms. Gilliard again declined to comply with Mr. Vaughn's order.  Instead, she filed a Motion for a Protective Order and a Motion for Temporary Restraining Order and Preliminary Injunction, both of which are presently before this Court.  *See generally* Mot. for Protective Order; Mot. for PI.  Ms. Gilliard asks this Court to "prevent [the FDIC] from compelling [her] to give [it] copies of audio tape recordings of conversations between her and FDIC employees" and to "protect[]" her from disciplinary action related to her refusal to turn over the recordings.  Mot. for Protective Order at 1; *see also* Mot. for PI at 1.  Ms. Gilliard's motions are now ripe for decision.

### III.  ANALYSIS

### A.  Plaintiff's Motion for a Protective Order is Denied

Ms. Gilliard asks this Court to enter a protective order forbidding the FDIC from compelling her to turn over copies of audio tapes containing conversations between her and her supervisors that she recorded surreptitiously while at work.  *See* Mot. for Protective Order at 1.  Ms. Gillard also requests "protect[ion] . . . from the Defendant taking disciplinary action against her for making the recordings and/or refusing to allow Defendant access to them."  Mot. for Protective Order at 1.  The Court concludes that Ms. Gilliard has not met her burden of showing good cause necessary for entry of a protective order and, thus, denies her motion.

Federal Rule of Civil Procedure 26(b) allows for "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1); *see also In re England*, 375 F.3d 1169, 1177 (D.C. Cir. 2004) ("The Federal Rules of Civil Procedure encourage the exchange of information through broad

discovery.")  However, under Federal Rule 26(c), a judge may, "for good cause," issue a

protective order limiting, among other things, the scope of discovery or the parties' ability to

disseminate information discovered during litigation "to protect a party or person from

annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).

To show good cause for entry of a protective order, the moving party "must articulate specific

facts to support its request and cannot rely on speculative or conclusory statements." *Friends of

the Earth v. U.S. Dep't of the Interior*, 236 F.R.D. 39, 41 (D.D.C. 2006) (quoting *Low v.

Whitman*, 207 F.R.D. 9, 10–11 (D.D.C. 2002)).  "Trial courts have 'broad discretion . . . to

decide when a protective order is appropriate and what degree of protection is required.'"

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 249 F. Supp. 3d 516, 520 (D.D.C.

2017) (omission in original) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)).  In

deciding whether to limit or deny discovery under Rule 26(c), courts balance "the

burdensomeness to the moving party against the requestor's need for, and relevance of, the

information sought." *Doe v. Provident Life & Acc. Ins. Co.*, 247 F.R.D. 218, 221 (D.D.C. 2008).

Courts may also consider a variety of other factors, including "the harm which disclosure would

cause to the party seeking to protect the information." *Burka v. U.S. Dep't of Health & Human

Servs.*, 87 F.3d 508, 517 (D.C. Cir. 1996); *see also United States v. Microsoft Corp.*, 165 F.3d

952, 960 (D.C. Cir. 1999) ("The 'good cause' standard in the Rule is a flexible one that requires

an individualized balancing of the many interests that may be present in a particular case.").

Assuming that the FDIC's order constituted a discovery request,[3] the Court finds that Ms.

Gilliard has not shown the good cause necessary for entry of a protective order.  Ms. Gilliard

_____

[3]  The parties disagree about whether the FDIC's demand constituted an informal
discovery request or an instruction related primarily to the internal affairs of the agency.  The
Court certainly agrees with the FDIC that Title VII does not invite the judiciary to micromanage

first urges that a protective order is warranted because she "had a right to make the recordings." Mot. for Protective Order at 1. She apparently bases this argument on the fact that District of Columbia law does not criminalize the surreptitious recording of a conversation by a party to that conversation. *See* Email from Gilliard to Polley (Oct. 30, 2014) (making such an argument in response to an order directing her to cease surreptitiously recording), Ex. F, ECF No. 52-6. However, the Court sees no reason why the legality of recording in the District of Columbia might preclude an employer from restricting its employees from recording or might suffice as a basis for barring an employer from demanding recordings made in defiance of a direction not to record without permission. Furthermore, Ms. Gilliard neglects to explain why the legality of her conduct might make turning over the tapes annoying, embarrassing, oppressive, expensive, or might cause undue burden.

---

an agency's internal affairs. *See, e.g.*, *DeJesus v. WP Co. LLC*, 841 F.3d 527, 534 (D.C. Cir. 2016) (noting that courts "are not 'a super-personnel department that reexamines an entity's business decisions'"); Def.'s Opp'n at 14 (arguing that a court should hesitate to interfere with federal agency's personnel actions). And the Court also recognizes that Rule 26(c) only affords district courts the power to regulate discovery; it does not permit a court to purport to control the use and dissemination of information obtained through means other than discovery. *See In re Rafferty*, 864 F.2d 151, 155 (D.C. Cir. 1988) (concluding that a protective order impermissibly regulated the disclosure of information that a party had obtained before litigation began); *see also, e.g.*, *Seattle Times Co.*, 467 U.S. at 34 ("[T]he party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes."). But the Court hesitates to suggest that a demand upon an employee to supply information relevant to a pending Title VII action is undeniably not a discovery request so long as the demand comes in the course of the employee's work duties. *Cf. E.E.O.C. v. City of Joliet*, 239 F.R.D. 490, 492–94 (N.D. Ill. 2006) (entering a protective order in a Title VII action barring a defendant-employer from compelling an employee to submit information about his immigration status that the employer requested only after the plaintiff filed his lawsuit and that had minimal relevance to the pending dispute). Because the Court finds that Ms. Gilliard has not shown good cause, the Court need not resolve this dispute.

Next, Ms. Gilliard asserts that a protective order is warranted because the FDIC is not entitled to the recordings outside of the normal course of discovery.[4] *See* Mot. for Protective Order at 1, 7–11. According to Ms. Gilliard, the FDIC seeks to jump the gun on accessing the tapes in order to "know exactly what other damaging evidence" Ms. Gilliard has to support her claims. Mot. for Protective Order at 7. As a threshold matter, the parties have now begun discovery, diminishing any force behind the argument that a protective order delaying the FDIC's access to the tapes is warranted at this point. Furthermore, it is not at all clear how the purportedly premature look at relevant evidence might prejudice Ms. Gilliard. The Court is not persuaded that the FDIC's demand might cause annoyance, embarrassment, oppression, expense, or undue burden to Ms. Gilliard of the sort that would justify entry of a protective order.

Ms. Gilliard next contends that the timeline that the FDIC offered her for submitting the tapes was "ridiculous" and "definitely oppressive" and that the options for submitting them were "impracticable, unworkable, and unenforceable." Mot. for Protective Order at 8–9. But it appears to this Court that the FDIC offered significant flexibility with respect to options for turning over the tapes. *See* Def.'s Opp'n at 20–22. Though Ms. Gilliard declares that the agency unreasonably asked her to turn over more than three years' worth of recordings in a matter of days and ordered her to do so using methods that might expose her other communications—including privileged communications with her attorney—she neglects to even clarify how many tapes she recorded over that time period, how long it might reasonably take her to produce the

---

[4] Though Ms. Gilliard suggests vaguely that she "may never have to turn over" some of the tapes, she fails to explain why this might be so. Mot. for Protective Order at 7. And the Court struggles to square this assertion with Ms. Gilliard's contentions that she made the tapes for the purpose of supporting her claims and that the tapes contain "damaging evidence." See Mot. for Protective Order at 4, 7. Thus, it appears to the Court that Ms. Gilliard's argument in favor of a protective order hinges largely on whether the timing of the demand was appropriate.

tapes, and whether she could have offered other methods for producing the tapes that would have been unobjectionable to her and to the agency. *See* Mot. for Protective Order at 9, 12. Thus, the Court has no basis for saying that the request was unreasonable or unworkable.

Perhaps more importantly, though, Ms. Gilliard fails to explain why the purported "impracticabil[ity]" of the FDIC's timeline might justify an order entirely barring it from demanding the tapes and prohibiting it from pursuing disciplinary action against her for refusing to provide the tapes. To the extent that Ms. Gilliard could not comply with the February 2018 order to submit the tapes in a matter of days, she has now had substantial notice that her employer expects her to turn over the tapes and plenty of opportunity to devise a plan for submitting them. The Court disagrees with Ms. Gilliard that any deviation from a court-imposed discovery schedule might warrant her requested protective order.

Finally, Ms. Gilliard contends that the FDIC only requested the tapes to harass her and to retaliate against her for bringing claims against the agency. *See* Mot. for Protective Order at 2; Pl.'s Reply at 2–3. However, this bald assertion does not justify the entry of a protective order. For one thing, Ms. Gilliard does not appear to contest that the audio tapes are relevant to this matter, and she has not shown that the discovery request is overbroad. *See* Mot. for Protective Order at 4, 7. Indeed, Ms. Gilliard contends that she recorded the tapes with an eye toward using them to support her claims. *See* Mot. for Protective Order at 4, 7. As a general matter, courts are hesitant to deny a party access to relevant discovery absent a showing that the request is "irrelevant, unduly burdensome, or otherwise improper." *Andrades v. Holder*, 286 F.R.D. 64, 66 (D.D.C. 2012); *see also, e.g.*, *Cartagena v. Centerpoint Nine, Inc.*, 303 F.R.D. 109, 113–14 (D.D.C. 2014) (granting a motion to compel discovery regarding plaintiff's immigration status because the matter was "highly relevant to a factual dispute at the heart of th[e] case"). Ms.

Gilliard has fallen well short of showing that discovery regarding the audio recordings should be barred.

In addition, as explained in greater detail below, the FDIC offers three non-retaliatory reasons for its demand. Specifically, the FDIC explained that it demanded the tapes (1) to obtain information necessary to perform a complete investigation of Ms. Gilliard's allegations against Mr. Mento, (2) because the audio recordings showed that Ms. Gilliard had violated the October 2014 order directing her not to surreptitiously record her conversations with FDIC employees, and (3) because the recordings might contain confidential information about FDIC employees. Second Order to Produce Recordings at 2, Ex. X. Ms. Gilliard claims that these explanations are pretextual, *see* Pl.'s Reply at 2–6, however, she offers little more than bald statements to support her position. In sum, the Court concludes that Ms. Gilliard has not shown good cause necessary for entry of a protective order and, therefore, it denies her motion.

**B. Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction is Denied**

Having rejected Ms. Gilliard's request for a protective order, the Court next considers her Motion for Temporary Restraining Order and Preliminary Injunction. "[A] preliminary injunction is an injunction to protect [the movant] from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." *Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 954 (D.C. Cir. 2005) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedures § 2947 (2d ed. 1992)). In the context of a Title VII action, such an injunction may be appropriate to ward against retaliation or reprisal by an employer and to "ensure the integrity and effectiveness of Title VII proceedings." *Wagner v. Taylor*, 836 F.2d 566, 573–74 (D.C. Cir. 1987). "[T]he decision to grant injunctive relief is a discretionary exercise of the district court's equitable powers." *John Doe Co. v.*

*Consumer Fin. Prot. Bureau*, 235 F. Supp. 3d 194, 201 (D.D.C. 2017) (quoting *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1209 (D.C. Cir. 1989)). A preliminary injunction is an "extraordinary remedy," and one is "never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To warrant preliminary injunctive relief, the moving party "must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in h[er] favor, and that an injunction is in the public interest." *Id.* at 20. "The standard that applies to preliminary injunctions also applies to temporary restraining orders." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

In her motion, Ms. Gilliard asks this Court to enter a temporary restraining order and preliminary injunction barring the FDIC from "taking disciplinary action against [her] for audio recording conversations . . . and/or for her failure to turn over any audio recordings of conversations between her and any of Defendant's employees in her possession." Mot. for PI at 1. Ms. Gilliard appears to base her request on her claim that the FDIC ordered her to turn over the audio tapes—and threatened disciplinary action if she refused to do so—as retaliation for her protected EEO activity.[5] *See* Mot. for PI at 8–10. As explained below, the Court finds that Ms. Gilliard has not shown that she is likely to succeed on the merits of her claim, has not shown that

---

[5] The FDIC does not appear to dispute this Court's authority to issue Ms. Gilliard's requested injunction. *See* Def.'s Opp'n at 29–30. *But see* Def.'s Opp'n at 31 & n.36. Generally, a plaintiff must exhaust her administrative remedies before bringing a Title VII claim to this Court. *See Sataki v. Broad. Bd. of Governors*, 733 F. Supp. 2d 22, 43 (D.D.C. 2010). However, in *Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987), the D.C. Circuit held that "federal district courts are authorized to afford interim injunctive relief against retaliatory transfers and other acts of reprisal while the administrative and judicial processes are ongoing." *Id.* at 570. *But see Sataki*, 733 F. Supp. 2d at 42–43 (explaining that a district court may only entertain a request for injunctive relief that seeks to preserve the status quo). Because this Court construes Ms. Gilliard's request as one to maintain the status quo, the Court finds that it has the authority to grant relief.

she would likely suffer irreparable harm absent entry of a temporary restraining order and preliminary injunction, and has not shown that the balancing of the equities and public interest considerations tip in her favor. Accordingly, the Court denies her motion.

**1. Plaintiff Has Not Shown That She is Likely to Succeed on the Merits of Her Claim**

The Court must first consider whether Ms. Gilliard has shown that she is likely to succeed on the merits of her claim that the FDIC demanded that she turn over her surreptitiously recorded audio tapes—and vowed disciplinary action for her refusal to do so—as retaliation for her protected EEO activity.[6] Ms. Gilliard asserts that she is likely to succeed on the merits of her claim because (1) District of Columbia law features no prohibition barring a party to a conversation from recording without the permission of others; (2) the FDIC has no agency-wide policy barring such recording; (3) the agency's reasons for forbidding the taping and for ordering her to turn over the tapes are farcical and its invocation of those reasons in this litigation are pretext; and (4) the methods and timeline that the agency designed for her to submit the recordings were "impracticable" and "unfathomable," in part because the plan could have resulted in the exposure of privileged communications between Ms. Gilliard and her attorney that are kept on the same device on which Ms. Gilliard has kept the requested audio recordings. *See* Mot. for PI at 9–11; *see also* Pl.'s Reply at 2–3, 9–13. Ms. Gilliard also asserts that she has

---

[6] The parties express some confusion about which claim Ms. Gilliard must show that she is likely to succeed on to meet her burden. *See* Def.'s Opp'n at 26 (noting that "it is less than clear upon which claim Plaintiff believes she is likely to succeed"). Both parties address whether Ms. Gilliard is likely to succeed on the hostile work environment claim asserted in her Second Amended Complaint, which referenced Ms. Butler's and Mr. Mento's October 2014 order to Ms. Gilliard that she cease surreptitiously recording her colleagues. *See* Def.'s Opp'n at 26–30; Pl.'s Reply at 16–20; 2d Am. Compl. ¶ 45. Both parties also consider whether Ms. Gilliard has shown that the February 2018 demand that Ms. Gilliard turn over the audio tapes was retaliatory. *See* Def.'s Opp'n at 31–36; Pl.'s Reply at 2–6, 18. Consistent with *Wagner*, the Court concludes that its analysis should focus primarily on the latter. *See Wagner*, 836 F.2d at 576 (assessing purported acts of reprisal that occurred after the filing of Plaintiff's complaint).

already turned over any audio recordings in her possession that might be relevant to the allegations that she included in her workers' compensation claim about Mr. Mento, and thus, the FDIC has no legitimate reason for requesting any other recordings. *See* Pl.'s Reply at 9, 21. The agency supplies nonretailiatory explanations for its actions and argues that Ms. Gilliard has not shown that any of the agency's explanations are pretextual. *See* Def.'s Opp'n at 30, 32–33. The Court agrees with the FDIC that Ms. Gilliard has not supplied evidence suggesting that the agency's explanations for its actions lack credence. Accordingly, the Court concludes that Ms. Gilliard has failed to show that she is likely to succeed on the merits of her retaliation claim.

Title VII of the Civil Rights Act of 1964 bars retaliation against an employee or job applicant because that individual has "made a charge, testified, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). In the absence of direct evidence, a claim of retaliation is analyzed under the three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff is first required to make out a *prima facie* claim of retaliation. *See id.* at 802. To do so, the claimant must show that she (1) "engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by h[er] employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Once the plaintiff establishes a *prima facie* case of retaliation, the burden of production shifts to the defendant to supply legitimate, nonretaliatory reasons for its actions. *See Baloch v. Kempthrone*, 550 F.3d 1191, 1199 (D.C. Cir. 2008). After the employer sets out a nonretaliatory reason for the employment action, the burden shifts back to the employee to "produce sufficient evidence that would discredit those reasons and show that the actions were retaliatory." *Id.* at

1200. "A plaintiff can meet this burden by casting doubt on the objective validity of the employer's explanation." *Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016).

Ms. Gilliard has not shown that she is likely to succeed on the merits of her retaliation case because she has not produced sufficient evidence that would discredit the FDIC's nonretaliatory explanations for ordering her to cease surreptitiously recording her colleagues, for demanding that she turn over audio tapes that she recorded in violation of that order, and for suggesting that it would pursue disciplinary action against Ms. Gilliard if she refuses to hand over the tapes. First, with respect to the agency's October 2014 order that Ms. Gilliard cease recording her colleagues, the agency explained to Ms. Gilliard that it issued the order because "[t]he FDIC has an interest in fostering trust and maintaining communication channels required for effective workplace relationships and for accomplishing the work of the FDIC." Email from Polley to Gilliard (Nov. 6, 2014), Ex. F, ECF No. 52-6. The agency gave Ms. Gilliard the instruction as soon as it became aware that she had been recording FDIC meetings without the consent of other parties. *See* Email from Polley to Gilliard (Nov. 6, 2014), Ex. F.

Ms. Gilliard confirms that she recorded conversations with her colleagues and explains that she did so in an effort to gather evidence to support her Title VII claims. *See* Mot. for PI at 5. She disputes the agency's rationale for ordering her to cease recording. According to Ms. Gilliard, the FDIC's proffered explanation is "a farce and without merit" because "[c]learly, there is no trust between the Plaintiff and Mr. Mento and other FDIC employees." Mot. for PI at 9. She notes that the FDIC has no agency-wide policy barring recording, and that her conduct was not unlawful. *See* Mot. for PI at 9–11. Ms. Gilliard also appears to argue that the agency's true reason for giving the order was to prevent her from gathering evidence to support her EEO claims. *See* Mot. for PI at 14; *see also* Email from Gilliard to Polley (Oct. 30, 2014), Ex. F.

Ms. Gilliard relies solely on speculation, and fails to offer any evidence to rebut the agency's nonretalitory explanation for its order. Ms. Gilliard's contention that the work environment lacked trusting relationships seems to support—not undermine—the FDIC's position that it ordered her to stop recording her colleagues to build trust in the workplace. And Ms. Gilliard's other assertions are equally unavailing. First, Ms. Gilliard fails to explain why the mere fact that her conduct is not legally barred might preclude her employer from nonetheless barring the conduct in the workplace for legitimate, nonretaliatory reasons. Second, that the FDIC has no agency-wide policy barring recording does not show that it ordered Ms. Gilliard to stop recording as retaliation for her protected EEO activity. The agency issued this order shortly after discovering that Ms. Gilliard had been recording meetings with her colleagues. *See* Email from Butler to Gilliard (Oct. 29, 2014), Ex. F, ECF No. 52-6. Ms. Gilliard points to no other employee who was also found to be recording, let alone identifies anyone else who the agency permitted to record. Third, Ms. Gilliard does little more than speculate about alternative motivations for the agency's direction. This does not satisfy her burden of showing that the agency's explanation was pretext.

With respect to the agency's February 2018 order directing Ms. Gilliard to turn over any audio tapes that she recorded after October 2014 without her colleagues' permission, the agency offered Ms. Gilliard three reasons why it issued the order. *See* Order to Provide Audio Files, Ex. W; Second Order to Produce Recordings, Ex. X. The FDIC explained that it had demanded the tapes (1) to obtain information necessary to perform a complete investigation of Ms. Gilliard's allegations against Mr. Mento, (2) because the audio recordings showed that Ms. Gilliard had violated the October 2014 order directing her not to surreptitiously record her conversations with FDIC employees, and (3) because the recordings might contain confidential information about

FDIC employees.  *See* Second Order to Produce Recordings at 2, Ex. X; *see also* Def.'s Opp'n at

30, 32–35.  Ms. Gilliard has failed to supply evidence refuting these reasons.

Ms. Gilliard contends that these explanations are pretext because the agency never before

expressed concern about or initiated an investigation into her earlier allegations of harassment.

*See* Pl.'s Reply at 2–4.  She offers that, instead of pursuing an investigation into the claims

against Mr. Mento that she mentioned in her workers' compensation claim, the agency sought

the audio recordings to "obtain in advance what [it] believe[s] might be damaging evidence in

the case at bar."  Pl.'s Reply at 4.  Ms. Gilliard fails to supply evidence to support her

contentions.  First, Ms. Gilliard contends that she asserted other harassment allegations, but they

were not similarly investigated.  *See* Pl.'s Reply at 3–4.  The Court finds this argument

unpersuasive.  While the FDIC's Anti-Harassment Program requires supervisors and managers to

"take immediate action to assess whether or not the alleged harassment occurred," the Program

does not require any specific action or mandate a fact-finding inquiry or investigation into every

allegation.  *See* Anti-Harassment Program at 4–5, Ex. I, ECF No. 52-9.  Without more

information about the nature of Ms. Gilliard's prior complaints and what steps the agency took

with respect to those allegations, the Court cannot conclude that the agency approached these

allegations differently or that any difference in the way that the agency approached these

allegations suggests that the investigation into the claims that were asserted in Ms. Gilliard's

workers' compensation claim was pretextual.[7]  Second, Ms. Gilliard fails to support her

_____

[7]  The Anti-Harassment Program in effect at the time that Ms. Gilliard filed her
September 2017, workers' compensation claim took effect in December 2015.  *See* Anti-
Harassment Program at 4, Ex. I, ECF No. 52-9.  The record presently before the Court does not
reveal what sort of anti-harassment program was in place before December 2015 and does not
show whether any of Ms. Gilliard's prior harassment complaints that are the subject of this
lawsuit—most of which are based on events occurring from a period from March 2013 to
December 2014—were investigated pursuant to the prior policy.  However, there is ample

contention that the real reason for the agency's request was to procure evidence relevant to this case sooner than discovery would otherwise allow. Ms. Gilliard offers no indication, for example, why the agency might have sought this evidence outside of the normal course of discovery or how she might be at all prejudiced if the agency received the audio tapes in advance of a court-imposed discovery schedule.

Ms. Gilliard next argues that the agency's order to turn over the tapes constituted a "fishing expedition." Pl.'s Reply at 10. She complains that the methods and timeline that the agency designed for her to submit the recordings were "impracticable" and "unfathomable," in part because the plan could have resulted in the exposure of privileged communications between Ms. Gilliard and her attorney that are kept on the same device on which Ms. Gilliard keeps the requested audio recordings. *See* Mot. for PI at 9–11; *see also* Pl.'s Reply at 2–3, 9–13. Ms. Gilliard also asserts that she has already turned over any audio recordings in her possession that might be relevant to the allegations that she included in her workers' compensation claim about Mr. Mento, and thus, the FDIC has no legitimate reason for requesting any other recordings. *See* Pl.'s Reply at 9–10, 21.

First, as noted above, Ms. Gilliard criticizes the methods and timeline that the agency designed for her to submit the tapes, but she fails to moor this criticism to any concrete information about, for example, how many tapes she might have to produce; how difficult it would be to produce them; and whether she might be able to produce the recordings on a timeline and using a method that is aggregable to both her and to the agency. She likewise fails

---

evidence showing that Ms. Gilliard's prior harassment allegations were, at the least, investigated through the EEO process. *See, e.g.*, Acceptance of Formal Discrimination Complaint at 2, Ex. MM (accepting for investigation a claim that Ms. Gilliard "was subjected to harassment that rose to the level of a hostile work environment"), ECF No. 18-39.

to demonstrate why she would not have been able to produce the requested recordings without exposing communications between her and her counsel. For one thing, if Ms. Gilliard agreed to email each audio recording to the FDIC—one of the options offered for submitting the tapes— presumably none of her protected communications would be revealed in the transfer. Second, Ms. Gilliard's assertion that she has already produced the audio tapes that she believes relate to her allegations against Mr. Mento does not suggest that the agency's explanations for its demand are pretext. The agency is not obligated to accept Ms. Gilliard's view of which tapes constitute relevant evidence. Furthermore, the agency supplied other reasons for seeking the tapes— namely, that the recordings appear to reveal that Ms. Gilliard defied an order directing her not to surreptitiously tape and that they might contain confidential information concerning other FDIC employees. These issues have not been resolved by Ms. Gilliard's submission of a handful of tapes that she believes relate to her allegations against Mr. Mento.

Finally, the agency explains that it would have a legitimate, nonretalitory reason for proposing disciplinary action for Ms. Gilliard's refusal to submit the audio recordings. *See* Def.'s Opp'n at 33–34. Specifically, Ms. Gilliard's refusal to turn over the tapes would defy two reasonable agency orders, constituting insubordination. *See* Def.'s Opp'n at 33–35. Ms. Gilliard appears to argue that this reason for proposing disciplinary action would be pretextual because she has already handed over all audio recordings that support her claim of harassment against Mr. Mento. *See* Pl.'s Reply at 14–15. Ms. Gilliard has not, however, undercut the agency's reasons for suggesting that it might propose disciplinary action. It ordered her to turn over *all* recordings that she made of her colleagues after October 2014, not just recordings that she deemed relevant to the allegations that she asserted in her September 2017 workers' compensation claim. *See* Order to Provide Audio Files, Ex. W; Second Order to Produce

Recordings, Ex. X.  That Ms. Gilliard turned over a portion of her audio recordings does not mean that the agency could not wish to initiate disciplinary action for nonretaliatory reasons based on her failure to fully comply with its orders.

In sum, Ms. Gilliard has not demonstrated that she is likely to succeed on the merits of her claim that the agency retaliated against her by requesting that she cease surreptitiously recording her colleagues and demanding that she turn over audio recordings that she made in defiance of that order.

### 2.  Plaintiff Has Not Shown That She Would Suffer Irreparable Harm

The Court next considers whether Ms. Gilliard has met her burden of showing irreparable harm.  Ms. Gilliard argues that, in the absence of a temporary restraining order or preliminary injunction, she would suffer irreparable harm because (1) she might face disciplinary action, including firing; (2) her refusal to provide the recordings might be labeled insubordination, and such a label might render her more susceptible to firing in the future; and (3) by having access to the audio recordings, the FDIC "would gain from being allowed to circumvent the discovery rules in this case."  *See* Mot. for PI at 11–12; Pl.'s Reply at 21.  The Court finds that Ms. Gilliard has not met her burden.

Courts in this jurisdiction have recognized that "[t]he concept of irreparable harm does not readily lend itself to definition."  *Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007).  Nonetheless, the D.C. Circuit has laid out "several well known and indisputable principles" that should underlie a court's analysis.  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  First, the party seeking preliminary injunctive relief must demonstrate that the claimed injury is "both certain and great" and "actual and not theoretical."  *Id.*  Second, the movant "must show that '[t]he injury complained of [is] of such imminence that

there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Id.* (alterations in original) (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976)). And, finally, the injury must be "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Some courts in this jurisdiction have found that "a more stringent showing of irreparable injury is required when a plaintiff, even in a Title VII case, seeks a preliminary injunction against the federal government in the personnel area." *Bonds v. Heyman*, 950 F. Supp. 1202, 1212 (D.D.C. 1997), *abrogated on other grounds*.

First, at this time, the FDIC has not actually proposed any disciplinary action against Ms. Gilliard. *See* Def.'s Opp'n at 31–32. Thus, it is difficult to say that Ms. Gilliard's as-yet-defined, potential injury is "both certain and great" and "actual and not theoretical." Second, Ms. Gilliard has not demonstrated that any proposed disciplinary action would constitute irreparable harm. As the FDIC argues, loss of employment is not legally irreparable. *See* Def.'s Opp'n at 36–38. The Supreme Court has stated that "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Consistent with that principle, courts in this jurisdiction have held that "loss of income does not constitute irreparable injury because the financial loss can be remedied with money damages." *Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Bd.*, 374 F. Supp. 2d 135, 142 (D.D.C 2005); *see also Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C 2006) ("[G]iven the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury."). To be sure, in "extraordinary cases" an employee may show that loss of employment constitutes irreparable harm. *See, e.g., Risteen v. Youth for Understanding,*

*Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C 2002) (finding that plaintiff had shown irreparable injury by demonstrating that he would not have access to "critical medical attention because he has lost his health insurance"); *Bonds*, 950 F. Supp. at 1210–15 (discerning irreparable harm with regard to a plaintiff who was 58 years old, had worked for the employer for nearly 40 years, had no college education, and plaintiff had shown "how much of her life [was] tied into her career"). But Ms. Gilliard has failed to explain why the present circumstances might constitute such an extraordinary matter. Furthermore, she has failed to explain why any other disciplinary action, short of termination, that she might face for her refusal to submit the audio recordings might constitute irreparable harm.

Third, Ms. Gilliard asserts that by having access to the audio recordings, the FDIC "would gain from being allowed to circumvent the discovery rules in this case." Pl.'s Reply at 21. But Ms. Gilliard neglects to explain *how* the FDIC would gain or why this gain might prejudice her such that it might constitute harm—let alone harm that is "certain and great." Thus, the Court concludes that Ms. Gilliard has not demonstrated that any proposed disciplinary action that might result from her refusal to hand over the tape constitutes irreparable harm.

### 3. Plaintiff Has Not Shown that the Balance of the Equities and Public Interest Considerations Favor Injunctive Relief

Next, Ms. Gilliard contends that balancing of the equities and public interest considerations favor granting her motion. *See* Mot. for PI at 12–15. She argues that the FDIC would suffer minimal harm should the Court order that Ms. Gilliard need not comply with the agency's command to submit the audio recordings. *See* Mot. for PI at 12–14. Ms. Gilliard suggests that the FDIC could seek production of the audio recordings in the course of discovery in this case, and that the agency should not be permitted to subvert normal discovery procedures to gain early access to discoverable materials and to gain access to materials that may not be

discoverable.  *See* Mot. for PI at 12–14.  She contends that, by contrast, in the absence of injunctive relief, the FDIC could "try to fabricate a defense or justification to counter what is said on the tapes."  Mot. for PI at 13.  Ms. Gilliard also claims that "after hearing what is on the tapes the Defendant is likely to retaliate against [her]."  Mot. for PI at 13.  Finally, Ms. Gilliard asserts that the public interest would be served by granting her requested relief because permitting the agency to demand the tapes might "send a chilling effect on other individuals who contemplate legally gathering proof of violation of their rights by their employers."  Mot. for PI at 14–15.  The FDIC disagrees, arguing that it would suffer substantial injury because its authority over personnel affairs would be undermined by a court order permitting Ms. Gilliard to defy its demand that she supply evidence related to an internal investigation.  Def.'s Opp'n at 38–41.  The Court finds that Ms. Gilliard has not met her burden.

In determining whether to grant a preliminary injunction "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (internal quotation marks omitted) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).  "In exercising their sound discretion, courts . . . should [also] pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  These considerations merge into one factor when the government is the non-movant.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

First, Ms. Gilliard has produced no evidence supporting her claim that the FDIC might "try to fabricate a defense or justification" or that the agency "is likely to retaliate" absent an injunction.  Second, the Court agrees with the FDIC that the Court's intervention in this matter, which appears to relate primarily to internal agency affairs, would undermine the agency's

ability to manage its own personnel and affairs.  Third, the Court finds unpersuasive Ms. Gilliard's bald contention that declining to grant her relief might have a chilling effect on employees' efforts to seek evidence supporting their Title VII claims.  Finally, the Court sees no reason for delaying the FDIC's access to the tapes on the basis that the Court's discovery schedule should govern when these tapes are released.

It should come as no surprise that the subjects of a Title VII suit may interact with one another regarding issues that relate only tangentially to the litigation. The timing of the FDIC's access to the disputed tapes appears to this Court to be such an issue.  The Court must not position itself as the arbiter of every barely-litigation-related, employee-employer dispute.  The Court concludes that Ms. Gilliard has not shown that the balancing of the equities and public interest considerations favor her requested relief.

## IV.  CONCLUSION

The FDIC ordered Ms. Gilliard not to surreptitiously tape record other FDIC employees. It appears that she has defied that order.  As a result, the FDIC appears to be considering whether to discipline Ms. Gilliard for her disobedience.  To the extent that Ms. Gilliard wishes to challenge any proposed discipline that results from her defiance, she must do so using the normal channels that she has available to her.  Accordingly, for the foregoing reasons, Plaintiff's Motion for Protective Order and Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction are **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 26, 2018                                         RUDOLPH CONTRERAS
                                                                      United States District Judge